[Cite as *Miller v. Miller*, 2011-Ohio-4299.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| | | |
|---|---|---|
| JANICE M. MILLER | | C.A. No. 10CA0034-M |
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| EVAN T. MILLER | | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | | CASE No. 00-DR-0613 |

DECISION AND JOURNAL ENTRY

Dated: August 29, 2011

---

BELFANCE, Judge.

{¶1} Appellant Evan T. Miller ("Husband") appeals the judgment of the Medina County Court of Common Pleas, Domestic Relations Division, adopting and approving Qualified Domestic Relations Orders ("QDROs") proposed by Janice M. Miller ("Wife"). For reasons stated below, we reverse.

I.

{¶2} This Court previously summarized much of this matter's facts and procedural history in a prior appeal:

"Husband and Janice M. Miller ("Wife") were married on October 25, 1969. Husband worked both before and during the parties' marriage and participated in each of the following retirement accounts: a United Airlines defined-benefit account, a Frank Russell Corporation 'A fund' account ('the Frank Russell account'), and a Retirement Advisors of America 'B fund' account ('the RAA account'). After Wife filed for divorce on August 10, 2000, the parties engaged in lengthy litigation, culminating in this appeal. The sole issue on appeal is whether the trial court properly divided Husband's two defined-contribution accounts, the Frank Russell and the RAA account ('the Accounts')."

"The parties' divorce hearing took place on July 25, 2001. At the hearing, the parties read an agreement into the record, part of which defined how they would distribute the Accounts. The record provides as follows:

"'There are some retirement pension accounts that are set forth on Attachment B[.] * * * [The Accounts] * * * are the United Airlines related accounts typically called the 'A' and 'B' funds. Those also will be divided taking into consideration the premarital component credit to [Husband] before the equal division. * * * The pension distribution-the 'A' and 'B' funds-will be handled through a qualified domestic relations' order.'

"On October 26, 2001, the trial court journalized the parties' divorce decree, using a proposed journal entry submitted by Husband. The relevant portion of the journal entry provides as follows:

"'The parties have agreed and the Court hereby orders that with respect to [Husband's] three (3) retirement plans through United Airlines, consisting of his monthly pension, the Frank Russell [account] []and the [RAA account], referred to respectively as the A and B Plans that those should be divided by Qualified Domestic Relations Orders ["QDROs"]. Said order shall be prepared by QDRO Consultants, and the parties agree that each shall be responsible for one-half of the expense of preparing such Qualified Orders. The date of the [QDROs] shall be a division on date of final hearing, which is as of July 25, 2001. The parties agree and the Court orders that the distribution by and between [Wife] shall be 50 percent of the marital covertures value therein. It is the express understanding and agreement of the parties and the order of the Court, that [Husband] was employed for some period of time prior to the date of marriage, and it is the agreement of the parties and the order of the Court, that defendant shall be entitled to his premarital share free and clear of the claims of [Wife], and that the remainder, attributable to the period of the marriage, shall be divided equally by [QDROs][.]'

"Despite the court's order, the parties were unable to agree on specific QDROs. Over the next five years, Husband and Wife prepared and submitted various competing QDROs." (Emphasis omitted.) *Miller v. Miller*, 9th Dist. No. 07CA0068-M, 2008-Ohio-2106, at ¶¶2-4. ("*Miller I*").

**{¶3}** On May 2, 2006, the trial court entered an order (the "2006 Order") in which it acknowledged that it was without jurisdiction to modify the divorce decree, but found that it had authority to interpret and enforce its own orders, including the divorce decree. The court rejected the submitted QDROs, finding that they did not reflect the terms set forth in the divorce decree, and set out a specific formula for the division of the Accounts.

{¶4} The parties then submitted further QDROs and appeared before a Magistrate, who issued a Magistrate's Decision on November 1, 2006. The decision issued by the Magistrate stated:

> "The only issue before this Magistrate is whether the Domestic Relations Orders proposed by [Wife] property [sic] effectuate the decree of divorce as construed in the [2006 Order]. The Magistrate finds that the proposed Orders do so. * * * The Court should accept the proposed Domestic Relations Orders and make them orders of the Court."

{¶5} Husband filed objections and a motion to reconsider, which the court treated as a motion for relief from judgment with respect to the 2006 Order pursuant to Civ.R. 60(B). The trial court held a hearing on February 2, 2007, which the court began by stating, "We're here on [Husband's] objections to the Magistrate's decision[.]" During the course of the hearing, Husband's counsel emphatically stated that the true error challenged was in the court's 2006 Order, which had set out the formula subsequently used in Wife's QDROs, and not in the Magistrate's Decision, which had merely interpreted and applied the 2006 Order.

{¶6} The trial court entered an order on June 29, 2007 (the "2007 QDRO Entry"). The 2007 QDRO Entry states:

> "This matter comes before the court on [Husband's] objections to the Magistrate's Decision issued on November 1, 2006, to determine if [Husband] is entitled to relief pursuant to Civ. R. 60(B), and to determine whether any of the [QDROs] submitted * * * effectuates the terms of the [divorce decree]."

{¶7} The court analyzed the 60(B) motion, then went on to compare the proposed QDROs, concluding that Wife's QDROs properly effectuated the terms of the divorce decree, as the Magistrate had concluded. The court concluded:

> "In summary, [Husband] is denied relief pursuant to Civ. R. 60(B) and the Court approves and adopts [Wife's] QDROs as effectuating the terms of the Agreed Judgment Entry of Divorce. The Magistrate's Decision is affirmed."

**{¶8}** Husband appealed, but this Court dismissed the appeal as untimely filed in light of *Wilson v. Wilson*, 116 Ohio St.3d 268, 2007-Ohio-6056. See *Miller I at* ¶¶7-8. Husband did not file an appeal to the Supreme Court of Ohio.

**{¶9}** In *Rothman v. Rothman*, 124 Ohio St.3d 109, 2009-Ohio-6410, the Ohio Supreme Court held that *Wilson* could not be applied in a way that denies the parties their right to appeal. Id. at ¶7. The Court instructed courts of appeals to allow similarly situated parties to file notices of appeal by March 31, 2010. Id. at ¶9. Citing *Rothman*, Husband appeals from the agreed judgment entry of divorce, the 2006 order, the QDRO entry, and Wife's QDROs, which the trial court adopted on June 29, 2007.

## II.

**{¶10}** This Court is obligated to raise, sua sponte, questions related to our jurisdiction. *Whitaker-Merrell Co. v. Geupel Constr. Co., Inc.* (1972), 29 Ohio St.2d 184, 186. This Court has jurisdiction to hear appeals only from final orders and judgments. Article IV, Section 3(B)(2), Ohio Constitution; R.C. 2501.02; R.C. 2505.03.

**{¶11}** On August 18, 2010, this Court issued an order citing *In re Strickler*, 9th Dist. Nos. 08CA009375, 08CA009393, 2008-Ohio-5813, ¶7-8, questioning whether it had jurisdiction to address the merits of the appeal, as the appeal involved the 2007 QDRO entry in which the trial court failed to explicitly rule on Husband's objections to the magistrate's decision. Husband's response essentially conceded that under our precedent, this Court would not have jurisdiction to address his appeal. Specifically, under the current state of the law in this district, the omission of an explicit ruling upon objections to a magistrate's decision amounts to a jurisdictional defect that affects the finality of a judgment. Id.

**{¶12}** However, recent changes to App.R. 4 have prompted this Court to reexamine whether a trial court's failure to specifically rule on objections to a magistrate's decision creates a jurisdictional bar to a merits appeal, or merely constitutes error that a party may raise on appeal.

**{¶13}** We begin with a discussion of former App.R. 4 and our case law interpreting it. In *In re K.K.*, 9th Dist. No. 22352, 2005-Ohio-3112, this Court was faced with an appeal from an entry overruling post-judgment objections to a magistrate's decision. Id. at ¶4. In addressing the matter, this Court set forth an analysis of the interplay of the then-recent amendments to Civ.R. 53 and App.R. 4 and the role those rules play in determining whether an entry involving post-judgment objections to a magistrate's decision is final and appealable. At the time, Civ.R. 53(E)(4)(c) provided that:

> "The court may adopt a magistrate's decision and enter judgment without waiting for timely objections by the parties, but the filing of timely written objections shall operate as an automatic stay of execution of that judgment until the court disposes of those objections and vacates, modifies, or adheres to the judgment previously entered." *In re K.K.* at ¶8, quoting Civ.R. 53(E)(4)(c).

Further, at the time the case was decided, App.R. 4(B)(2) provided that:

> "In a civil case or juvenile proceeding, if a party files a timely motion for judgment under Civ. R. 50(B), a new trial under Civ. R. 59(B), vacating or modifying a judgment by an objection to a magistrate's decision under Civ. R. 53(E)(4)(c) or Rule 40(E)(4)(c) of the Ohio Rules of Juvenile Procedure, or findings of fact and conclusions of law under Civ. R. 52, the time for filing a notice of appeal begins to run as to all parties when the order disposing of the motion is entered." *In re K.K.* at ¶9, quoting App.R. 4(B)(2).

**{¶14}** We concluded in *In re K.K.* that "[b]y amending App.R. 4 to allow a tolling of appeal time, the Supreme Court clearly intended that its amendment to Civ.R. 53 and Juv.R. 40 authorized trial courts to issue final, appealable orders prior to the filing of objections to the magistrate's decision, but that those judgments would be temporarily stayed upon the filing of

timely written objections." *In re K.K.* at ¶10. We went on to note that, because of the mandatory language in Civ.R. 53 and App.R. 4, the trial court's entry entering judgment "could not become final and appealable until the trial court explicitly disposed of the objections." Id. at ¶11.

{¶15} In 2008, in *In re Strickler*, this Court considered whether an entry in which a trial court failed to rule on pre-judgment objections was final and appealable. Id. at ¶¶2-6. Unlike the movant in *In re K.K.*, the movant in *In re Strickler* filed his objections to the magistrate's decision after the decision issued, but before the trial court took action upon it. *In re Strickler* at ¶¶3-4. In entering judgment upon the magistrate's decision, the trial court failed to explicitly rule upon the objections. Id. at ¶10. Drawing upon our jurisdictional analysis in *In re K.K.*, we considered the mandatory language in Civ.R. 53(D)(4)(d) which stated that "'[i]f one or more objections to a magistrate's decision are timely filed, the court shall rule on those objections.'" *In re Strickler* at ¶8, quoting Civ.R. 53(D)(4)(d). In keeping with *In re K.K.*'s determination that a court's failure to explicitly dispose of objections to a magistrate's decision renders its judgment entry non-final, we also concluded that, in the context of a pre-judgment objection to a magistrate's decision, the failure of the trial court to rule upon the objections was a jurisdictional defect. *In re Strickler* at ¶8; *In re K.K.* at ¶11. Essentially, this Court's conclusion that a trial court's failure to rule on pre-judgment objections was a jurisdictional defect was based upon the premise that a trial court's failure to rule on post-judgment objections was a jurisdictional defect as set out in *In re K.K.* The law of this district has therefore been that a trial court's failure to rule on objections, whether pre- or post-judgment, constitutes a jurisdictional defect warranting dismissal of the appeal. See *In re Strickler* at ¶10; *In re K.K.* at ¶11. Both the mandatory language contained in Civ.R. 53 and the then-existing version of App.R. 4 dictated that result.

{¶16} However, on July 1, 2011, the 2011 amendments to the Rules of Appellate Procedure became effective. See App.R. 43(X). App.R. 4(B)(2), as amended, now provides that:

"In a civil case or juvenile proceeding, if a party [timely and appropriately] files * * *

"(c) objections to a magistrate's decision under Civ. R 53(D)(3)(b) or Juv. R. 40(D)(3)(b),

" * * *

"then the time for filing a notice of appeal from the judgment or final order in question begins to run as to all parties when the trial court enters an order resolving the last of these post-judgment filings.

"*If a party files a notice of appeal from an otherwise final judgment but before the trial court has resolved one or more of the filings listed in this division, then the court of appeals, upon suggestion of any of the parties, shall remand the matter to the trial court to resolve the post-judgment filings in question and shall stay appellate proceedings until the trial court has done so.* After the trial court has ruled on the post-judgment filing on remand, any party who wishes to appeal from the trial court's orders or judgments on remand shall do so in the following manner: (i) by moving to amend a previously filed notice of appeal or cross-appeal under App. R. 3(F), for which leave shall be granted if sought within thirty days of the entry of the last of the trial court's judgments or orders on remand and if sought after thirty days of the entry, the motion may be granted at the discretion of the appellate court; or (ii) by filing a new notice of appeal in the trial court in accordance with App. R. 3 and 4(A). In the latter case, any new appeal shall be consolidated with the original appeal under App. R. 3(B)." (Emphasis added.)

{¶17} The italicized language in the rule implies that a trial court's failure to rule on post-judgment objections to a magistrate's decision is not a jurisdictional defect as the rule refers to the entry as "an otherwise final judgment[.]" App.R. 4(B)(2). Further, the rule does not state, or even imply, that it is appropriate to dismiss an appeal from a judgment because the trial court failed to rule on post-judgment objections. This notion is confirmed by the relevant portion of the Staff Note to the 2011 amendments to App.R. 4 which provides that:

"New language has been added to both App. R. 4(B)(2) and App. R. 4(B)(3) to resolve confusion in the courts of appeals about the finality of a judgment and the

proper disposition of an appeal if a party files a notice of appeal before all proper and timely post-trial filings are resolved or if a party makes a timely post-trial filing after the notice of appeal if filed. *Some courts have held that the trial court judgment is not final while a proper post-judgment filing is pending and have, accordingly, dismissed the appeal.* See, e.g., *Dragway 42, LLC v. Kokosing Constr. Co.*, 9th Dist. No. 09CA0008, 2009-Ohio-5630, at ¶6; *In re Talbert*, 5th Dist. No. CT2008-0031, 2009-Ohio-4237, at ¶20-22. *Others have held that the judgment is final but that the case should be remanded to the trial court to rule on the motions.* See, e.g., *Stewart v. Zone Cab of Cleveland*, 8th Dist. No. 79317, 2002-Ohio-335, at 6. *The rule now adopts the latter view and also establishes a procedure for the parties to bring into the appeal the trial court's subsequent rulings on the post-judgment filings.*" (Emphasis added.) 2011 Staff Notes to App.R. (4).

{¶18} Thus, the 2011 amendments to App.R. 4(B)(2) and the accompanying Staff Note lead this Court to conclude that the Supreme Court does not intend the failure of a trial court to rule on post-judgment objections in an entry to constitute a jurisdictional defect, despite the fact that the court's judgment does not strictly comply with Civ.R. 53. See Civ.R. 53(D)(4)(d)-(e)(i) (requiring the trial court to rule on timely filed objections and indicate whether it is vacating, modifying or adhering to its previously entered judgment). In light of this clarification, we believe it is necessary to overrule certain portions of our precedent as detailed below. To the extent that *In re K.K.* concluded that a trial court's entry entering judgment "could not become final and appealable until the trial court explicitly disposed of the [post-judgment] objections[,]" *In re K.K.* at ¶11, we determine that it is properly overruled. Further, as the primary basis for *In re Strickler*'s holding is the same portion of *In re K.K.* that is properly overruled, we likewise overrule *In re Strickler.*

{¶19} Accordingly, a trial court's failure to rule on objections to a magistrate's decision will not cause this Court to dismiss an appeal from the trial court's final judgment. Nonetheless, the entry that is the subject of the appeal, still must constitute a final judgment or order. See Article IV, Section 3(B)(2), Ohio Constitution; R.C. 2501.02; R.C. 2505.03. Assuming the entry

is a final judgment, the appropriate mechanism to challenge a trial court's failure to rule on the objections as required by Civ.R. 53 would now be via an assignment of error, which would only be sustained if the trial court's failure to rule constituted reversible error. See Civ.R. 61.

{¶20} Turning to the instant matter, as the only reason this Court questioned the finality of the 2007 QDRO Entry was that entry's failure to comport with *In re Strickler*, which we have just overruled, we are satisfied that we possess jurisdiction to address the merits of this appeal.

III.

ASSIGNMENT OF ERROR I

"THE TRIAL COURT ERRED IN ORDERING A DIVISION OF THE APPELLANT'S RETIREMENT ACCOUNTS THAT WAS CONTRARY TO THE PARTIES' IN-COURT SETTLEMENT AND THEIR SUBSEQUENTLY FILED DECREE OF DIVORCE."

{¶21} Husband argues in his single assignment of error that the trial court erred in its division of two of Husband's retirement accounts, the Frank Russell account and the RAA account, via QDROs. Those QDROs were modeled after the 2006 Order, which Husband asserts fails to follow the terms of the parties' in-court settlement and the terms of the decree as it fails to incorporate the figures set forth in Attachment B of the decree which specifically described what portions of the accounts were premarital and ultimately delineated the overall percentages of the accounts each party would receive. Husband further asserts that by failing to incorporate the distribution percentages specified in Attachment B, the 2006 Order and the QDROs adopted by the trial court improperly deny Husband appreciation on his premarital contributions and improperly deny him the agreed upon sum of $29,224.91 which was intended to equalize the distribution of marital property. We agree.

{¶22} "Pension or retirement benefits earned during the course of a marriage are marital assets and a factor to be considered in the division of property." *Wilson* at ¶5. A QDRO

"implements a trial court's decision of how [retirement benefits are] to be divided incident to divorce or dissolution." Id. "While a court has the power to enforce a property division incorporated into a divorce decree, a trial court may not modify that property division." (Citations omitted.) *Straw v. Straw*, 9th Dist. No. 04CA008433, 2004-Ohio-4065, at ¶4. The instant matter involves an agreed judgment entry of divorce. "An agreed divorce decree, like a separation agreement, is an agreement of the parties that is made an order of the court. Contract principles apply to the interpretation of such agreements, and the interpretations are reviewed *de novo* on appeal as questions of law." *Zimmer v. Zimmer* (Feb. 27, 2001), 10th Dist. No. 00AP-383, at *2. "Contracts are to be interpreted to carry out the intent of both parties, as evidenced by contractual language." *Schaffer v. First Merit Bank, N.A.*, 186 Ohio App.3d 173, 2009-Ohio-6146, at ¶23.

{¶23} We turn, then, to the language of the decree:

"With respect to the parties' remaining assets, the parties have identified certain assets identified on documents titled 'Attachment A' and 'Attachment B.' * * * With respect to Attachment B, the Court finds that the distribution called for on Attachment B with [Wife] getting the accounts and items listed under her name, and [Husband] getting the accounts and items listed under his name, is the agreement of the parties, provided however that the Frank Russell [account] and the [RAA account] shall be treated differently as set forth immediately below.

"The parties have agreed and the Court hereby orders that with respect to [Husband's] three (3) retirement plans through United Airlines, consisting of his monthly pension, the Frank Russell [account], and the [RAA account], referred to respectively as the A and B plans that those should be divided by [QDROs]. Said orders shall be prepared by QDRO consultants, and the parties agree that each shall be responsible for one-half of the expenses of preparing such Qualified Orders. The date of the [QDROs] shall be a division on date of final hearing, which is as of July 25, 2001. The parties agree and the Court orders that the distribution by and between [Wife] shall be 50 percent of the marital covertures value therein. It is the express understanding of the parties and the order of the Court, that [Husband] was employed for period of time prior to the date of marriage, and it is the agreement of the parties and the order of the Court, that [Husband] shall be entitled to his premarital share free and clear of the claims of

[Wife], and that the remainder, attributable to the period of the marriage, shall be divided equally by [QDROs] between [Husband and Wife].

"It is further the agreement of the parties and the order of the Court that Attachment A and Attachment B are intended to provide both sides with an equal value of the parties' marital assets. Thus, in order to equalize the distribution on Attachment B, [Husband] was receiving some $29,200 more than [Wife] was from the [RAA account]. It is the intent of the parties and the agreement, that the distribution by and between the parties on Attachment B shall in fact continue to be equal. Therefore, [Husband] shall receive an additional amount, either from the [RAA account] or from some other account as maybe agreed upon by and between the parties, to equalize his distribution with [Wife's] distribution of the parties' marital assets, excluding any reference to his premarital contribution to the retirement accounts. In order to facilitate an expeditious resolution of the conclusion of the [QDROs], the Court orders that the parties shall determine whether the amount is coming from the [RAA account] in an amount necessary to equalize the distributions on Attachment B, or from some other account.

"* * *

"Due to the somewhat complicated nature of the parties' agreement and the requirement for future orders, sales and distributions, the Court expressly retain[s] jurisdiction to enforce the parties' agreement, as may be necessary to carry out their intent and the order of this Court."

{¶24} Accompanying and attached to the decree were four attachments. Attachment B listed the parties' various retirement benefits by plan name, account number, and party. The first portion of Attachment B listed each account and identified a column for Wife and a column for Husband with corresponding values representing the marital portions of the accounts. With respect to the Frank Russell account, Husband and Wife are listed as each receiving the same amount. With respect to the RAA account, Husband is listed as receiving $29,224.90 more than Wife. Further, detailed immediately below those figures are calculations of Husband's premarital share of the two accounts followed by the percentage each party was to receive of each of the two accounts. This portion of the exhibit makes clear that these premarital sums are not included in the figures above it where the marital portions of the accounts are listed and divided. The overall tabulations provided in Attachment B are listed below:

"Frank Russell [account] — Mr. Miller ($91,064.61 + $308,529.17)/$708,122.97 = 56.43%

Frank Russell [account]—Mrs. Miller $308,529.17/$708,122.97 = 43.57%

[RAA account]—Mr. Miller (46,428.48 + $259,224.76)/$535,653 = 57.06%

[RAA account]—Mrs. Miller $229,999.86/$535,653.10 = 42.94%[.]"

{¶25} The 2006 Order of the trial court, which rejected all the QDROs submitted, interpreted the above as follows:

"The Agreed Judgment Entry of Divorce indicates that [Wife] will receive one-half the 'marital coverture' valued as of July 23, 2001 and adjusted as necessary to ensure an overall equal division of property. Instead of spelling out a coverture formula, the language in the Agreed Judgment entry of Divorce clearly and unambiguously awards the Husband his premarital contributions to the plans and defines the remainder as 'attributable to the period of the marriage.' Thus, 'coverture' in the Agreed Judgment Entry is defined as the plans' account balances as of July 23, 2001 less the [H]usband's premarital contributions. A QDRO that accurately reflects the parties' agreement would subtract an amount equal to the account balance on the date of marriage from the account balance as of July 23, 2001 and then award fifty percent of the remainder to [Wife], adjusted as needed to effectuate an equal division of property."

{¶26} The parties again submitted proposed QDROs. Ultimately, in 2007, the trial court adopted Wife's proposed QDROs, concluding that Wife's QDROs "equally divide the marital portions of the retirement plans valued as of the date of distribution and less [Husband's] separate premarital contributions." With respect to the Frank Russell account, Wife's QDRO provided that Husband would retain $19,450.36 of the account before equally dividing the remainder. The $19,450.36 represented the sum of two figures: (1) Husband's premarital *contributions* to the Frank Russell account "plus growth to the date of the marriage[,]" which equaled $4,838; and (2) $14,612.46. Wife agreed in her brief to the trial court that she received $29,224.91 more than Husband in the property division; however, without explanation she asserted that Husband was entitled to only $14,612.46, or half of that amount. Wife's proposed QDRO equally divided the RAA account without setting aside any portion representing

Husband's premarital contribution. Thus, it is clear that the QDROs that were adopted by the trial court do not utilize the figures or percentages set forth in Attachment B.

{¶27} While this Court acknowledges that the language used within the decree to discuss the parties' retirement assets is somewhat confusing and inartful in its choice of terminology, we conclude that much of that confusion is eliminated by considering Attachment B in conjunction with the language of the decree. Attachment B, which is referred to in the decree as constituting "the agreement of the parties," sets forth an example of what the parties meant by the language contained within the decree concerning division of the retirement accounts. It sets forth Husband's premarital interest in both the Frank Russell account and the RAA account and sets forth each party's marital interest in both. It seems unlikely that the parties would go to the trouble of not only creating Attachment B, but also agreeing to the judgment entry of divorce which included Attachment B as part of the agreed entry, if the parties did not intend that Attachment B should be given effect. The QDROs as adopted by the trial court, fail to take into consideration the figures and percentages set forth, and ultimately agreed to by the parties, in Attachment B and as a result, the trial court's interpretation fails to give effect to the intent of the parties and to the entirety of the decree. "If a divorce decree is susceptible to two possible interpretations, a court must adopt an interpretation that gives effect to the decree in its entirety without eliminating a part of the decree." *Ward v. Ward* (1983), 13 Ohio App.3d 302, paragraph one of the syllabus.

{¶28} Wife appears to assert that Attachment B is not to be considered in the division of the Frank Russell account and the RAA account because of the language contained in the following paragraph of the decree:

> "With respect to Attachment B, the court finds that the distribution called for on Attachment B with [Wife] getting the accounts and items listed under her name,

and [Husband] getting the accounts and items listed under his name, is the agreement of the parties, provided however that the Frank Russell [Account] and [RAA account] shall be treated *differently* as set forth immediately below. (Emphasis added.).

{¶29} Wife asserts that the above means that the Frank Russell account and the RAA account should be treated differently than set forth in Attachment B. However, such an interpretation would fail to give any effect or meaning to the detailed percentages and calculations involving the Frank Russell account and the RAA account listed in Attachment B. The use of the word "differently" could also be interpreted to mean that the Frank Russell account and RAA account should be treated differently than the other accounts listed in Attachment B. Dividing the Frank Russell account and RAA account as provided in Attachment B does treat those two accounts differently than the remainder of the retirement assets. As this interpretation gives effect to both the language of the decree *and* Attachment B, we conclude that it is a more reasonable interpretation. See id.

{¶30} Accordingly, as the trial court's interpretation of the decree fails to give effect to the entire document and fails to give effect to the intent of the parties, we sustain Husband's assignment of error. We remand the matter to the trial court so that QDROs incorporating the terms of the decree as exemplified by Attachment B can be issued.

IV.

{¶31} In light of the foregoing, we sustain Husband's assignment of error, reverse the judgment of the Medina County Court of Common Pleas, Domestic Relations Division, and remand the matter for proceedings consistent with this opinion.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

_____
EVE V. BELFANCE
FOR THE COURT

WHITMORE, J.
CONCURS

DICKINSON, P. J.
CONCURS IN JUDGMENT ONLY, SAYING:

{¶32} Mr. and Mrs. Miller divorced in 2001 after 32 years of marriage. At the time of their divorce, they had, between them, ten retirement accounts. One of those accounts was a defined benefit plan held in Mr. Miller's name. That account has been divided using a Qualified Domestic Relations Order and is no longer at issue in this case. The remaining nine accounts

were apparently all defined contribution plans: five in Mrs. Miller's name and four in Mr. Miller's name. The five accounts in Mrs. Miller's name were marital property because they contained only assets purchased with funds deposited during the marriage or purchased with account earnings during the marriage. Two of the accounts in Mr. Miller's name were also marital property. One contained only assets purchased with funds deposited in it during the marriage or purchased with account earnings during the marriage. The other contained 478 shares of United Airlines stock obtained during the marriage. The other two accounts in Mr. Miller's name, known as the Russell account and the Retirement Advisors account, included some assets purchased with funds deposited prior to the marriage, some assets purchased with funds deposited during the marriage, and assets purchased with account earnings both prior to and during the marriage.

{¶33} The parties agreed that the total value of the marital property held in the retirement accounts would be divided equally between them. They further agreed that, to the extent the Russell and Retirement Advisors accounts contained Mr. Miller's separate property, he would receive that separate property. As part of their agreement, they submitted to the trial court a document labeled "Attachment 'B.'" "Attachment 'B'" explained in detail their agreement about how the retirement accounts would be divided.

{¶34} In order to facilitate division of the accounts, "Attachment 'B'" provided that, to the extent possible, the parties would each receive accounts held in their own names. That is, Mrs. Miller would receive the five accounts in her name and Mr. Miller would receive the two accounts in his name that contained only marital property. Finally, they agreed that Qualified Domestic Relations Orders should be entered dividing the Russell and Retirement Advisors accounts.

{¶35} As of June 30, 2001, the total value of the five accounts held in Mrs. Miller's name was $122,239.73. As of that same date, the total value of the two accounts in Mr. Miller's name containing only marital property was $93,014.82. In order to equalize the distribution of those accounts, therefore, the parties agreed that Mr. Miller would receive $29,224.90 more from the marital part of the Retirement Advisors account than Mrs. Miller would receive (the difference between $122,239.73 and $93,014.82).

{¶36} As of June 30, 2001, the total value of the Russell and Retirement Advisors accounts was $1,243,776.05. The parties agreed in "Attachment 'B'" that, of that amount, $1,106,282.96 was marital property and $137,493.09 was Mr. Miller's separate property. They further agreed, therefore, that, if those two accounts were divided as of June 30, 2001, Mr. Miller would receive from those accounts his separate property of $137,493.09 plus $567,753.93 of the marital property for a total of $705,247.02 and Mrs. Miller would receive from those accounts the remaining $538,529.03, representing her share of the marital property. (As discussed in the preceding paragraph, Mr. Miller was to receive $29,224.90 more of the marital property from the Retirement Advisors account in order to equalize the distribution of the other accounts.) Accordingly, under the agreement contained in "Attachment 'B,'" if the distribution had occurred on June 30, 2001, each party would have received marital property worth $660,768.76 and Mr. Miller would have received separate property worth $137,493.09.

{¶37} Because of the need to prepare Qualified Domestic Relations Orders to divide the Russell and Retirement Advisors accounts, those accounts could not simply be divided as of June 30, 2001. To facilitate their later division, therefore, "Attachment 'B'" contained a calculation of the percentage of ownership of each party in each of those accounts as of that date. As of June 30, 2001, Mr. Miller had a 56.43% interest in the Russell account and Mrs. Miller had a 43.57%

interest in that account. As of that same date, Mr. Miller had a 57.06% interest in the Retirement Advisors account and Mrs. Miller had a 42.94% interest in that account. Mr. Miller was retired at the time the parties divorced so "Attachment 'B'" did not contemplate any further deposits being made in either account. Application of those percentages to the total values of the accounts when they are actually divided will assign to each party their interests as of June 30, 2001, plus any increase or minus any decrease in the value of the accounts between June 30, 2001, and the date of the division at the same ratio as the ratio of their ownership on June 30, 2001. There is one last thing that needs to be understood about "Attachment 'B'": The $137,493.09 listed on it as the value of Mr. Miller's separate property interest in the Russell and Retirement Advisors accounts consisted of the value of assets purchased with funds deposited in those accounts before the parties were married plus assets purchased with earnings on those pre-marital assets regardless of whether those earnings occurred before or after the marriage.

{¶38} The trial court attached "Attachment 'B'" to its divorce decree and specifically referred to it in that decree: "With respect to Attachment B, the Court finds that the distribution called for on Attachment B with [Mrs. Miller] getting the accounts and items listed under her name, and [Mr. Miller] getting the accounts and items listed under his name, is the agreement of the parties, provided however that the Frank Russell Corporation and Retirement Advisors of America accounts shall be treated differently as set forth immediately below." That is, consistent with "Attachment 'B,'" the trial court ordered that Mrs. Miller receive the five accounts held in her name and Mr. Miller receive the two accounts held in his name that contained only marital property.

{¶39} In the next two paragraphs of its divorce decree, the trial court addressed the Russell and Retirement Advisors accounts, along with the defined benefit account with which we

are no longer concerned. Regarding the Russell and Retirement Advisors accounts, the court wrote: "The parties agree and the Court orders that the distribution by and between [Mrs. Miller] shall be 50 percent of the marital covertures value therein. It is the express . . . agreement of the parties and the order of the Court, that [Mr. Miller] was employed for some period of time prior to the date of marriage, and it is the agreement of the parties and the order of the Court, that [he] shall be entitled to his premarital share free and clear of the claims of [Mrs. Miller], and that the remainder, attributable to the period of the marriage, shall be divided equally by Qualified Domestic Relations Order between [Mrs. Miller] and [Mr. Miller]." The court continued, specifically reciting some parts of "Attachment B" but not reciting other parts: "It is further the agreement of the parties and the order of the Court that Attachment A and Attachment B are intended to provide both sides with an equal value of the parties' marital assets. Thus, in order to equalize the distribution on Attachment B, [Mr. Miller] was receiving some $29,200 more than [Mrs. Miller] was from the Retirement Advisors of America. It is the intent of the parties and the agreement, that the distribution by and between the parties on Attachment B shall in fact continue to be equal. Therefore, [Mr. Miller] shall receive an additional amount, either from the Retirement Advisors of America account or from some other account as may be agreed upon by and between the parties, to equalize his distribution with [Mrs. Miller's] distribution of the parties' marital assets, excluding any reference to his premarital contribution to the retirement accounts. In order to facilitate an expeditious resolution of the conclusion of the Qualified Domestic Relations Order, the Court orders that the parties shall determine whether the amount is coming from the Retirement Advisors of America account in an amount necessary to equalize the distributions on Attachment B, or from some other account." Although the language of the divorce decree will not win any prizes for lucidity, it is clear that it was intended to implement

the distribution explained in detail in "Attachment 'B.'" The one change it made from "Attachment 'B'" was that, while "Attachment 'B'" contemplated the equalization coming from the Retirement Advisors account, the decree gave the parties the option to use a different account to achieve that equalization. They have not designated a different account, so the equalization still must come from the Retirement Advisors account.

{¶40} Despite the fact that both parties agreed to the distribution explained in "Attachment 'B,'" they have been unable to agree upon Qualified Domestic Relations Orders implementing that language. At some point, they submitted competing proposed Qualified Domestic Relations Orders to the trial court, and, in May 2006, the trial court rejected those proposed orders. In doing so, it directed the parties that Mr. Miller's separate property interest in the Russell and Retirement Advisors accounts was limited to an amount equal to the value those accounts had on the day the parties were married. Although the court acknowledged that it would be a "better approach" to "allocate the growth and/or loss attributable to the separate property interest and marital interest and value it all on the date of distribution," it held that the divorce decree had not provided for such attribution.

{¶41} Following the trial court's May 2006 rejection of the competing proposed Qualified Domestic Relations Orders, Mrs. Miller submitted new proposed Qualified Domestic Relations Orders for the Russell and Retirement Advisors accounts. The proposed order for the Russell account directed that Mr. Miller receive as separate property assets worth $4838, the value of the Russell account on the day the parties were married. In addition, despite the fact that Mrs. Miller had received $29,224.91 more than Mr. Miller from the distribution of the accounts held in their separate names, it inexplicably directed that Mr. Miller receive only one

half that amount, $14,612.46, to purportedly equalize the distribution. Mrs. Miller's proposed order for the Retirement Advisor's account simply divided that account equally.

{¶42} Mrs. Miller's proposed orders were initially considered and adopted by a magistrate, and Mr. Miller filed objections to the magistrate's decision. The trial court overruled his objections and entered Mrs. Miller's proposed Qualified Domestic Relations Orders as submitted. Mr. Miller has appealed and assigned as error the trial court's adoption of Mrs. Miller's proposed Qualified Domestic Relations Orders.

{¶43} Despite the trial court's later confusion, its 2001 divorce decree incorporated "Attachment 'B,'" which was attached to that decree. Accordingly, the parties were entitled to Qualified Domestic Relations Orders that implemented "Attachment 'B.'" The Qualified Domestic Relations Orders adopted by the trial court do not do that. Accordingly, I concur in the sustaining of Mr. Miller's assignment of error. The duty of the trial court on remand is to adopt Qualified Domestic Relations Orders implementing "Attachment 'B.'" That is, it is the trial court's duty to adopt a Qualified Domestic Relations Order that provides Mr. Miller 56.43% of whatever the value of the Russell account is on the day that order is implemented and provides Mrs. Miller the remaining 43.57% of that value. It is the further duty of the trial court to adopt a Qualified Domestic Relations Order that provides Mr. Miller 57.06% of whatever the value of the Retirement Advisors account is on the day that order is implemented and provides Mrs. Miller the remaining 42.94% of that value.

APPEARANCES:

MICHELLE L. SLIMAK, Attorney at Law, for Appellant.

JOSEPH F. SALZGEBER, Attorney at Law, for Appellee.