[Cite as *In re M.B.*, 2012-Ohio-5428.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

IN RE: M.B.

C.A. Nos.    11CA010060
                11CA010062

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    10JC29176

DECISION AND JOURNAL ENTRY

Dated: November 26, 2012

CARR, Judge.

{¶1} Appellants, Bobbie Z. ("Mother") and Steven B. ("Father"), each appeal from a judgment of the Lorain County Court of Common Pleas, Juvenile Division, that awarded legal custody of their minor child, M.B., to his paternal great aunt and paternal great uncle. This Court affirms in part and reverses in part.

I.

{¶2} Mother and Father are the unmarried parents of M.B., born on February 24, 2010. Mother had one other child, S.Z., born on August 11, 2000, with a different father. S.Z.'s custody is not at issue in this appeal.

{¶3} Mother's history with Lorain County Children Services ("LCCS") goes back approximately ten years. At that time, Mother had been incarcerated for violating a term of her probation, attendance in a substance abuse program, which was imposed following a conviction for a drug trafficking offense. LCCS formally intervened and obtained emergency custody of

S.Z.  On January 8, 2003, S.Z. was adjudicated to be a neglected and dependent child, and he was placed in the legal custody of his maternal grandparents.  On October 12, 2004, after Mother's release from prison, she regained legal custody of S.Z.

{¶4}    More recently, Mother was convicted of domestic violence and was again placed on probation.  During her term of probation, she tested positive for cocaine use three times while she was also pregnant with M.B.  Upon being diagnosed as "cocaine dependent," she entered a residential treatment program.  Ten-year-old S.Z. was not allowed to reside at the facility with Mother, and the staff soon determined that Mother could not properly care for newborn M.B. there either while also addressing her substance abuse issues.  No relative caregivers were available.

{¶5}    Accordingly, on March 25, 2010, the agency filed a complaint, alleging that the children were abused, neglected, and dependent.  The court granted emergency temporary custody to the agency, and the children were removed from Mother's care.  From this point, the custody of the two children proceeded separately, and this opinion will be concerned only with the custody of M.B.

{¶6}    In due course, the trial court adjudicated M.B. to be a neglected and dependent child and granted temporary custody to the agency.  LCCS initially placed M.B. with local foster parents and later placed him with a paternal great aunt and great uncle who resided in Kentucky. On January 13, 2011, the agency sought an order granting legal custody of M.B. to the Kentucky relatives.  Mother opposed the motion and sought custody in herself or, alternatively, an extension of temporary custody.  Following a hearing on both motions, the trial court granted legal custody to the Kentucky relatives.

{¶7}    Mother and Father have each appealed from the judgment of the trial court. Mother has assigned three errors for review, and Father has advanced one assignment of error on appeal.

II.

**MOTHER'S ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION, WHEN OVER THE OBJECTIONS OF MOTHER, IT ADOPTED THE JUDGMENT OF THE MAGISTRATE GRANTING LEGAL CUSTODY OF [M.B.] TO A PATERNAL GREAT AUNT AND GREAT UNCLE, WHERE THE PROPOSED LEGAL CUSTODIANS HAD FAILED TO EXECUTE A STATEMENT OF UNDERSTANDING FOR LEGAL CUSTODY AS REQUIRED.

{¶8}    Mother contends that the trial court erred in granting legal custody to M.B.'s paternal great aunt and great uncle because the proposed legal custodians did not file a statement of understanding, as described in R.C. 2151.353(A)(3), with the court prior to the dispositional hearing.  For its part, LCCS contends that a R.C. 2151.353(A) statement of understanding was not necessary because the motion for legal custody was not filed by the proposed custodians, but was filed instead by the agency under R.C. 2151.415 and that section of the Revised Code does not require such a statement.

{¶9}    The record reflects that LCCS filed a written motion seeking legal custody in the Kentucky relatives approximately six weeks prior to the dispositional hearing.  The relatives did not prepare and sign a statement of understanding as described in R.C. 2151.353(A)(3), but, at the hearing, the paternal great aunt testified at some length.  She testified to her desire to be the legal custodian of M.B., her ability to provide for the needs of the child, the fact that she is committed to M.B.'s long-term care, and her understanding and acceptance of the fact that the status of legal custody leaves residual rights with the parents.  Three visitations with Mother had

already taken place. In addition, the great aunt was available for questioning by the trial court and cross-examination by the other parties. Consequently, the relative essentially addressed the matters that would be contained within a written statement of understanding under R.C. 2151.353(A)(3) through her testimony in court.

{¶10} Significantly, Mother did not object to the lack of a statement of understanding by the proposed legal custodians at a time when the error, if any, could have been corrected. In other words, she failed to object to the lack of a statement of understanding either prior to the dispositional hearing or at the hearing itself. Mother concedes that she did not contemporaneously object to the lack of a statement of understanding, but asserts that her failure to do so does not constitute a forfeiture of the issue because she subsequently filed a written objection to the magistrate's decision on this ground. She also invokes the doctrine of plain error.

{¶11} The filing of a written objection to the decision of a magistrate is not a substitute for the obligation to object to a purported error at the time of its occurrence. Indeed, "[t]he contemporaneous objection rule is fundamental to our jurisprudence." *Steward v. Norris Bros. Co., Inc.*, 8th Dist. No. 53540, 1988 WL 32117, *1 (Mar. 17, 1988). The rule serves the interest of justice because it allows for the correction of many defects while they are readily curable, as well as it encourages the elimination of delay and the unnecessary use of the appellate process. *State v. Brooks,* 2d Dist. No. 9190, 1987 WL 12231,*5 (June 4, 1987). In this case, any purported error could have been very easily corrected had an objection been timely entered. Moreover, even if R.C. 2151.353(A)(3) is applicable here, given that the paternal great aunt addressed the substance of that statute through her testimony at the dispositional hearing, the matter would not rise to the level of plain error. Mother's first assignment of error is overruled.

**MOTHER'S ASSIGNMENT OF ERROR II**

THE TRIAL COURT ERRED IN VIOLATION OF JUV.R. 40(D)(4)(d), WHEN IT FAILED TO RULE ON MOTHER'S OBJECTION TO THE MAGISTRATE'S DECISION.

{¶12} Mother contends the trial court erred in failing to specifically rule on her written objection to the magistrate's decision regarding the failure of LCCS to submit a statement of understanding under R.C. 2151.353(A)(3). She contends that, as a result, this Court lacks jurisdiction because there is no final appealable order. Mother cites this Court's decision in *Weygandt v. Porterfield*, 9th Dist. No. 09CA0009, 2011-Ohio-510, ¶ 2 in support of her position.

{¶13} After the magistrate issued his decision, granting legal custody to the Kentucky relatives, Mother filed several written objections, including an objection to the claimed lack of compliance with R.C. 2151.353(A)(3) by the proposed custodians. In ruling on Mother's objections, the trial judge concluded: "It is therefore ordered, adjudged and decreed that Mother's objections are overruled." Mother contends, on appeal, that the trial court erred in so ruling because "until a trial court specifically resolves objections by explicitly stating the resolution of each, no final appealable order exists."

{¶14} Mother's reliance on this Court's decision in *Weygandt* is misplaced. First, the judgment entry in that case consists of three separate and divergent opinions. Therefore, the lead opinion lacks precedential value as an opinion of the entire Court. Second, in support of her claim that this Court lacks jurisdiction to consider the merits of the present appeal, Mother cites a portion of *Weygandt* that relies upon a case that has since been overruled. *See id.*, at ¶ 2, *citing In re Strickler*, 9th Dist. Nos. 08CA009375 and 08CA009393, 2008-Ohio-5813, *overruled*, *Miller v. Miller*, 9th Dist. No. 10CA0034-M, 2011-Ohio-4299.

{¶15} Finally, the reference to language in *Weygandt* concerning ruling on "each" objection is taken out of context. The question of whether a trial judge must rule separately on every objection to a magistrate's decision was not before this Court in *Weygandt*. Rather, in relevant part, the members of the *Weygandt* panel considered and disagreed upon whether the language of the trial judge that Mr. Weygandt's objections "should be overruled" was explicit and precise enough to indicate that the trial judge did "actually overrule objections." *Weygandt*, at ¶ 10 and 12. In the lead opinion, Judge Whitmore wrote that the "fact that something should be done does not mean that it has actually been done." *Id.* at ¶ 10. Presiding Judge Dickinson dissented because he concluded that the trial judge's "clear intention was to explicitly overrule the objections to the magistrate's decision[,]" *id.* at ¶ 57, while Judge Belfance concurred in judgment only and stated that "[a] majority of the Court does not agree with the analysis of the dissent." *Id.* at ¶ 13. None of the separate opinions in *Weygandt* advocated that the trial judge must separately and individually rule upon each objection to a magistrate's decision as is suggested by Mother in the present appeal. The *Weygandt* opinion does not hold that a trial judge must do so.

{¶16} In stating: "It is therefore ordered, adjudged and decreed that Mother's objections are overruled[,]" the trial judge explicitly overruled Mother's objections in full satisfaction of Juv.R. 40(D)(4)(d). It was not necessary for the trial judge to separately rule on each objection made by Mother. Clearly, the trial judge overruled them all. Accordingly, Mother's second assignment of error is overruled.

**MOTHER'S ASSIGNMENT OF ERROR III**

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION, WHEN OVER THE OBJECTIONS OF MOTHER, IT ADOPTED THE JUDGMENT OF THE MAGISTRATE GRANTING LEGAL CUSTODY OF [M.B.] TO A PATERNAL GREAT AUNT AND GREAT UNCLE, WHERE SUCH JUDGMENT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶17} Mother contends that the trial court erred in granting legal custody of M.B. to relatives because neither the decision of the magistrate nor the judgment of the trial judge mentions the guardian ad litem's recommendation that custody be returned to Mother. Mother reasons that the failure to mention the recommendation of the guardian ad litem equates to a failure to consider it, and further claims that such failure constitutes error because the trial court judgment is against the weight of the evidence.

{¶18} To the extent that Mother challenges the judgment as being against the weight of the evidence, this Court will review the evidence before the trial court. The record establishes that M.B. resided with Mother for approximately one month at the treatment center before being removed to a foster placement for eight months, and then to the home of relatives where he has remained since November 17, 2010.

{¶19} There were concerns with Mother's ability to care for M.B. even while she was at the treatment center. The staff believed that Mother was not keeping M.B.'s bottles clean and was not cleaning him well at diaper changes. A crisis point was reached, however, when the staff formally expressed its concern to Mother about her lack of progress in her substance abuse treatment. Mother became irate and abruptly began swinging the baby without even supporting his head. At that point, LCCS initiated proceedings to remove M.B from the facility and from Mother's care because M.B.'s safety could not be ensured.

{¶20} Thereafter, Mother's interaction with M.B. took place through visits. To Mother's credit, two case aides testified that Mother was generally nurturing and attentive during visits and that she regularly brought clothing and toys for her son to those visits. However, those same aides, a caseworker and a police officer, all testified to several incidents of aggressive and volatile behavior by Mother, similar to the incident that took place at the residential treatment center. One such example took place at the courthouse after a visitation hearing. Mother became verbally aggressive upon learning that her older son, S.Z., was having visits with his father when she was not present.

{¶21} Mother also lost control of her emotions on several occasions during visits with her children. A case aide explained that when Mother gets frustrated, her behavior continues to escalate and the staff is unable to redirect or calm her. Service providers were occasionally frightened by Mother's behavior, and they were concerned that they might not be able to protect the children from Mother's anger and aggressive actions.

{¶22} Mother's June 30, 2010 visit with M.B. is illustrative. At that time, Father had been excluded from visits because of his inappropriate behavior. Father was still providing transportation for Mother, however, and he telephoned her during that visit to say he wanted to pick her up early. Mother became angry at him and inappropriately conveyed her complaints to the children. The aide cautioned Mother against involving the children in such issues. Mother then declared that she was going to take the children out of foster care. She became agitated, rocked, and cried with M.B. in her arms. The aide repeatedly cautioned her to maintain appropriate behavior, but Mother became very anxious and her conduct kept escalating until it became "explosive." The aide attempted to end the visit, and the supervisor came in to assist. When the caseworker asked the older child to follow her out of the room, Mother "was dangling"

the screaming baby with one arm and grabbing the arm of her older son with her other arm, causing S.Z. to be confused about what he should do. After outbursts such as this, Mother's visitation with M.B. was changed from four to two hours weekly and a sheriff's deputy was required to be present.

{¶23} Two additional incidents took place in the month prior to the February 28, 2011 legal custody hearing. First, on January 31, 2011, Mother left a threatening phone message for her caseworker. According to the caseworker, Mother complained that the caseworker had stated that she was not completing her case plan and was telling people she was explosive. The caseworker repeated a part of Mother's message: "I'm going to show you explosive and knock you the "f--- out, b----.""

{¶24} Second, on February 19, 2011, local police responded to a 911 call from Mother's home. It was the second time police were called to the home in two days. When they arrived, they found Mother to be furious with Father and wanted him removed from the home. The police explained that they could not force him to leave because he was a resident of the home. Mother then told the police officers to "get the F out." Mother called police dispatch again and screamed at them over the telephone. Mother's landlord called the police just a few minutes later with concern for Mother's well-being because she was still yelling and screaming. One of the attending officers testified that in 17 years of police work, he had never seen a person so out of control.

{¶25} In addition to her intermittently volatile behavior, Mother had a ten-year history of substance abuse and treatment that included several relapses along the way. Mother's substance abuse counselors stated that Mother had met her "milestones" in treatment, but had failed to internalize the treatment she had received. There was concern that Mother might

relapse again. One counselor explained that Mother was stepped down from residential treatment to outpatient treatment only because she had gotten all she was going to get from the residential program. The counselor expressed concern with the fact that Mother continued her relationship with Father who had a history of substance abuse and mental health issues. Mother told the caseworker that she did not want to be apart from Father or to live alone. One of the case aides, who had responsibility for scheduling Mother's drug screens, noted that Mother had refused three to five screens within the past month.

{¶26} Mother's mental health counselor explained that Mother also has a history of mental health challenges and that she had been engaged in counseling intermittently since 2003, with her case being closed several times for lack of attendance. The counselor called attention to the fact that Mother's own mother had previously supported her financially and with child care, but she is now deceased. The caseworker expressed concern with Mother's judgment and cited Mother's habit of speaking to S.Z. as an adult. Mother thought there was nothing wrong with that because he knew everything already. The caseworker believes Mother is unable to apply what she has been taught and lacks insight into her problems.

{¶27} Regarding the child's relationship with the relatives, the caseworker explained that M.B. had resided with his great aunt and uncle for three months by the time of the hearing. The caseworker visits the child there monthly. M.B. is doing well and had formed an attachment to the family. He goes to the great aunt for comfort and has good play interaction with the great uncle. He is doing well physically and is meeting developmental milestones. The great aunt and uncle are facilitating visits with Mother. The caseworker said that there were no current concerns with M.B. in that home and expressed the belief that it is in the best interest of the child to be in the legal custody of his great aunt and great uncle. The agency does not believe Mother

is able to care for a child due to her long history of mental health challenges, domestic violence, inability to control anger and aggression, substance abuse of cocaine, and generally poor judgment.

{¶28} The guardian ad litem recommended, on the other hand, that M.B. should be placed with Mother, reasoning that Mother had completed most of her case plan and she saw no reason why custody should not be granted to Mother. Without further explanation, she felt that Mother had made "great improvement" with her substance abuse addiction. The guardian acknowledged that Mother still needed to address her mental health problems. Although her written report pre-dated the recent incident involving police being called to Mother's home, she did not believe that incident would impact her previously reached recommendation.

{¶29} On cross-examination, the guardian ad litem acknowledged that she had not seen one-year-old M.B. for three months and had never seen him in his Kentucky placement. Moreover, she conceded that her recommendation might be more accurate if she had seen M.B. in Kentucky, but that she could not drive that far for health reasons. Significantly, in her testimony and final report, the guardian offered no information or evaluation regarding the relationship between M.B. and his parents or about their interactions during visits. In her earlier interim report, the guardian ad litem stated that there was little activity during visits between Mother, Father, and the children.

{¶30} On appeal, Mother argues that neither the magistrate nor the trial judge considered the recommendation of the guardian ad litem. Mother did not object to the decision of the magistrate on the basis of a failure to mention or consider the recommendation of the guardian ad litem. Consequently, Mother could be found to have forfeited the right to assign it as error on appeal. Juv.R. 40(D)(3)(b)(iv). Moreover, as we have often noted, the statutory

scheme regarding an award of legal custody following an adjudication of abuse, neglect or dependency does not include a specific test or set of criteria that must be considered beyond a broad determination of the best interest of the child. *See, e.g., In re N.P.*, 9th Dist. No. 21707, 2004-Ohio-110, ¶ 23.

**{¶31}** Even so, we observe that the trial judge included in his judgment entry that he considered the arguments of the parties, the transcripts of the proceedings, and the evidence presented at the hearing in arriving at his decision. The trial judge was not required to specifically comment upon all of the evidence heard or considered. Because the report and testimony of the guardian ad litem were included in the evidence before the court, we presume that the trial judge considered them. Based upon this Court's careful review of the entire record, the recommendation of the guardian ad litem does not outweigh the abundance of evidence in favor of granting legal custody to the relatives. Accordingly, Mother's third assignment of error is overruled.

### **FATHER'S ASSIGNMENT OF ERROR**

> THE TRIAL COURT ERRED IN NOT AWARDING [FATHER] VISITATION
> WITH THE MINOR CHILD.

**{¶32}** Father asserts the trial court erred in failing to address the issue of visitation in its order granting legal custody of M.B. to relatives.

**{¶33}** Father's initial case plan provided for supervised visits with his son while an order of temporary custody to the agency was in effect. Two months later, an amended case plan indicated that Father's visits were stopped because of inappropriate behavior during a supervised visit. Thereafter, the court granted legal custody to relatives, but failed to include an order regarding visitation. Although the trial court made a finding of fact that Father had no visitation at the time, the judgment entry includes no court order regarding visitation going forward.

**{¶34}** Father contends that he is entitled to reasonable visitation and asserts his "fundamental interest in the care, custody, and management" of his child. These rights, however, are not absolute, but "are always subject to the ultimate welfare of the child." *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). Where, as here, a child has been adjudicated abused, dependent or neglected, that judgment "implicitly involves a determination of the unsuitability of the child's parents." *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, ¶ 22. As the parent of a neglected and dependent child whose legal custody is being awarded to a non-parent, Father no longer retains the full range of parental rights, but rather only "residual parental rights, privileges and responsibilities," which include "the privilege of reasonable visitation[.]" R.C. 2151.353(A)(3)(c). *See also* R.C. 2151.011(B)(48). Furthermore, in a case where there has been an adjudication of abuse, neglect or dependency, a juvenile court is permitted to "[c]ontrol any [parental] conduct or relationship that will be detrimental or harmful to the child." R.C. 2151.359(A)(1). Accordingly, Father is not guaranteed visitation with his son, but visitation remains an issue to be considered and ruled upon by the juvenile court.

**{¶35}** Because the trial court did not rule upon the matter of visitation at the time it granted legal custody of M.B. to relatives, this Court remands this matter to the trial court for consideration of the question of parental visitation. Father's assignment of error is sustained.

III.

**{¶36}** Mother's three assignments of error are overruled. Father's assignment of error is sustained. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed in part and reversed in part.

Judgment affirmed in part,
and reversed in part.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

DONNA J. CARR
FOR THE COURT

WHITMORE, P. J.
CONCURS.

BELFANCE, J.
CONCURRING IN JUDGMENT ONLY.

{¶37} I concur with most of the majority opinion, but write separately to address Father's assignment of error regarding visitation. In my view, the problem with the issue of visitation is not the absence of a ruling, but rather that the ruling is ambiguous. Accordingly, on that basis, I agree that the matter should be remanded to the trial court for clarification.

APPEARANCES:

BARBARA A. WEBBER, Attorney at Law, for Appellant.

HOLLACE B. WEIZEL, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and AMY L. PRICE, Assistant Prosecuting Attorney, for Appellee.