[Cite as *In re J.B.*, 2019-Ohio-1929.]

STATE OF OHIO ) IN THE COURT OF APPEALS
)ss: NINTH JUDICIAL DISTRICT
COUNTY OF LORAIN )

IN RE: J.B.

C.A. No. 18CA011424

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No. 18JC53984

DECISION AND JOURNAL ENTRY

Dated: May 20, 2019

---

TEODOSIO, Presiding Judge.

{¶1} Appellant Mother appeals the judgment of the Lorain County Court of Common Pleas, Juvenile Division, that adjudicated her child J.B. abused, neglected, and dependent. This Court affirms

I.

{¶2} Mother is the biological mother of J.B. (d.o.b. 4/26/13). Father appeared in the juvenile court and asserted that he did not wish to participate in any proceedings regarding the child.

{¶3} Based on injuries discovered on the child's body, Lorain County Children Services ("LCCS" or "the agency") filed a complaint alleging that J.B. was an abused, neglected, and dependent child. After an adjudicatory hearing, the magistrate issued a decision finding the child to be abused, neglected, and dependent. The juvenile court adopted the magistrate's decision the same day. Mother filed timely objections. The juvenile court heard the arguments

of counsel at a hearing on the objections. Subsequently, the juvenile court issued a judgment overruling Mother's objections and adhering to its prior judgment adjudicating J.B. an abused, neglected, and dependent child. Mother filed a timely appeal in which she raises three assignments of error for review.

## II.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED WHEN IT ADMITTED AS EVIDENCE, UH ELYRIA REGIONAL MEDICAL CENTER OUTPATIENT SUMMARY, REGISTRATION HISTORY, AND CLINICAL CHART, WHEN SUCH RECORD CONTAINED HEARSAY.

{¶4} Mother argues that the juvenile court erred by admitting the child's medical records into evidence at the adjudicatory hearing. Mother's argument is not well taken.

{¶5} A review of the record indicates that the magistrate declined to admit the child's medical records as evidence after Mother's objection to their admission during the adjudicatory hearing. Instead, the magistrate merely allowed the agency to proffer the medical records. In addition, the magistrate expressly asserted that he did not need to consider the medical records to make his decision. Rather, he found J.B. to be abused, neglected, and dependent based on the remaining "overwhelming evidence" adduced at the hearing. Moreover, at the hearing on Mother's objections, Mother's attorney admitted that the magistrate had not considered the medical records in his decision. The juvenile court further did not indicate that it would consider the medical records when ruling on the objections. The juvenile court's judgment in which it overruled Mother's objections and adhered to its prior judgment of adjudication does not reference any consideration of the child's medical records. As there is nothing to indicate that the juvenile court admitted or considered J.B.'s medical records, Mother's argument fails. Mother's first assignment of error is overruled.

ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED WHEN IT PERMITTED THE CHILD'S OUT OF COURT STATEMENTS TO BE ADMITTED AS EVIDENCE.

**{¶6}** Mother argues that the juvenile court erred by considering testimony by the agency caseworker and the child's school nurse regarding statements made by the child that Mother's boyfriend had caused the child's injuries, because those statements contained inadmissible hearsay. This Court disagrees.

**{¶7}** While this Court generally reviews the trial court's action with respect to a magistrate's decision for an abuse of discretion, we do so with reference to the nature of the underlying matter. *In re I.R.*, 9th Dist. Summit No. 27775, 2016-Ohio-2919, ¶ 8, citing *Fields v. Cloyd*, 9th Dist. Summit No. 24150, 2008-Ohio-5232, ¶ 9, and *Tabatabai v. Tabatabai*, 9th Dist. Medina No. 08CA0049-M, 2009-Ohio-3139, ¶ 18. Given the broad discretion accorded to trial courts to admit or exclude evidence, this Court "will not disturb evidentiary rulings absent an abuse of discretion 'that produced a material prejudice' to the aggrieved party." *In re I.W.*, 9th Dist. Wayne Nos. 07CA0056 and 07CA0057, 2008-Ohio-2492, ¶8, quoting *State v. Roberts*, 9th Dist. Summit No. 21532, 2004-Ohio-962, ¶ 14. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

**{¶8}** It is well established that the juvenile court must strictly adhere to the rules of evidence during the adjudicatory hearing. *In re E.R.*, 9th Dist. Medina No. 05CA0108-M, 2006-Ohio-4816, ¶ 41, citing *In re Baby Girl Baxter*, 17 Ohio St.3d 229, 233 (1985). Evid.R. 802

proscribes the admission of hearsay. Accordingly, hearsay is not admissible for purposes of adjudication. *In re E.R.* at ¶ 41.

{¶9} Evid.R. 803 sets forth multiple exceptions to the hearsay rule. Mother argued below and on appeal that this case involves the application of Evid.R. 803(4) which permits the admission of

> [s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Mother argues that the juvenile court erred in determining that the child's statements were made for purposes of diagnosis or treatment, rather than for some other purpose.

{¶10} The Supreme Court of Ohio has clarified that a child-declarant's competency is not an issue that must be determined in these cases. Instead, the only issue relevant to the admission of a child's statements pursuant to Evid.R. 803(4) is whether the statements were made for purposes of medical diagnosis or treatment. *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, ¶ 46. The high court set out a nonexhaustive list of considerations to determine the purpose of the child's statements, including (1) whether the child's statements were elicited in a leading or suggestive manner; (2) whether a motive to lie exists, e.g., in relation to a "bitter custody battle[;]" and (3) whether the child understood the need to be truthful to the medical provider. *Id.* at ¶ 49, quoting *State v. Dever*, 64 Ohio St.3d 401, 410 (1992). Other contextual considerations include the child's age, the consistency of the child's assertions, and whether the interview of the child was conducted pursuant to proper protocol. *Id.*

{¶11} The school nurse testified that she receives ongoing training relevant to her duties at the school, some of which has addressed the identification of abuse in children. She explained that she routinely conducts a head-to-toe assessment of a child who comes to her with an issue.

In addition, she questions the child about how he feels and the reason for his visit to determine what medical treatment is required. If the nurse is concerned about what she learns following her exam and questioning, she then calls in the principal to assess the need for further action. But the nurse was clear that she conducts her evaluation of the children in her clinic to determine whether and what kind of medical treatment is necessary.

{¶12} In this case, J.B. was almost five years old when he was brought to the nurse's clinic after complaining that his back hurt and a teacher saw bruising all over the child's back. The nurse adhered to her established protocol and told J.B. that she heard he had a "boo-boo." The child told her he did and added, "I don't know what Daddy hit me with." When conducting a head-to-toe evaluation of J.B., the nurse observed a "very large goose egg" which appeared to be fresh on the back of the child's head. She then observed a multitude of bruises that appeared to be several days old covering the child's back. After the nurse asked J.B. how he got those the child responded that his daddy got mad after the child did not put on his seatbelt.

{¶13} The nurse conducted her standard evaluation of the child and asked open-ended questions. The child was able to clearly articulate the general cause of his injuries. Even though he could not identify the instrument used, he was able to describe the context and perpetrator. J.B. was consistent in his responses. There was no indication that the child was motivated to lie to the nurse. Based on a consideration of the circumstances surrounding J.B.'s disclosures to the nurse, the juvenile court did not err by determining that the child's statements were made for the purpose of medical treatment. Accordingly, the juvenile court did not abuse its discretion by admitting the child's statements to the nurse pursuant to Evid.R. 803(4).

{¶14} Mother also challenges the admission of the child's statements to a doctor at University Hospitals Elyria Medical Center as testified to by the LCCS caseworker. Mother

argues that the caseworker was not competent to testify that the child's statements were made for purposes of medical diagnosis or treatment, because only the doctor could provide that information. Because the doctor did not testify at the adjudicatory hearing, Mother asserts that the child's statements merely overheard by the caseworker are not admissible.

{¶15} Neither Mother nor LCCS provide any legal authority regarding whether a witness who overhears a patient's comments made to a doctor may testify as to the patient's statements for purposes of Evid.R. 803(4). Assuming, without deciding that the juvenile court erred by admitting the caseworker's testimony regarding J.B.'s statements to the doctor, this Court concludes that any error was harmless. J.B.'s statements to the doctor that his daddy caused his injuries were merely cumulative of the nurse's testimony that we have already concluded was admissible. For the foregoing reasons, Mother's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

> THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FOUND [J.B.] TO BE AN ABUSED CHILD, A NEGLECTED CHILD, AND A DEPENDENT CHILD, AS THOSE FINDINGS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶16} Mother argues that the juvenile court's findings that J.B. was an abused, neglected, and dependent child are against the manifest weight of the evidence. This Court disagrees.

{¶17} Juvenile abuse, neglect, and dependency cases are initiated by the filing of a complaint. *See* Juv.R. 22(A); Juv.R. 10; R.C. 2151.27(A). The complaint is "the legal document that sets forth the allegations that form the basis for juvenile court jurisdiction." Juv.R. 2(F). The juvenile court must base its adjudication on the evidence adduced at the adjudicatory hearing to support the allegations in the complaint. *See In re Hunt*, 46 Ohio St.2d 378, 380 (1976). If

allegations in the complaint are not proved by clear and convincing evidence at the adjudicatory hearing, the juvenile court must dismiss the complaint. Juv.R. 29(F); R.C. 2151.35(A)(1). Clear and convincing evidence is that which will "'produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶18} This Court reviews as follows:

In determining whether the juvenile court's adjudication of dependency is against the manifest weight of the evidence, "this court [reviews] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [adjudication] must be reversed[.]"

(Alterations sic.) *In re R.L.*, 9th Dist. Summit No. 28387, 2017-Ohio-4271, ¶ 8, quoting *In re C.S.*, 9th Dist. Summit No. 26178, 2012-Ohio-2884, ¶ 5, quoting *In re A.W.*, 195 Ohio App.3d 379, 2011-Ohio-4490, ¶ 8 (9th Dist.).

{¶19} Mother challenges the findings that J.B. is abused, neglected, and dependent as alleged in the complaint. An abused child is one who "[e]xhibits evidence of any physical or mental injury or death, inflicted other than by accidental means, or an injury or death which is at variance with the history given of it." R.C. 2151.031(C). Discipline rises to the level of abuse in some instances, e.g., where it is "excessive under the circumstances and creates a substantial risk of serious physical harm to the child[.]" R.C. 2919.22(B)(3); *see also* R.C. 2151.031(C). A neglected child is one "[w]ho lacks adequate parental care because of the fault or habits of the child's parents, guardian, or custodian[.]" R.C. 2151.03(A)(2). A dependent child is one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]" R.C. 2151.04(C). In addition,

[a] dependency finding under [Revised Code Section] 2151.04(C) does not require specific parental fault; rather the focus is on the child's situation to determine whether the child is without proper or adequate care or support. *In re R.P.*, 9th Dist. Summit No. 26836, 2013-Ohio-5728, ¶ 19. "The conduct of the parent is relevant only insofar as it forms a part of the child[ ]'s environment and it is significant only if it has a detrimental impact on [him]." *In re A.C.* at ¶ 14, citing *In re Burrell*, 58 Ohio St.2d 37, 39 (1979).

*In re I.T.*, 9th Dist. Summit Nos. 27513, 27560, and 27581, 2016-Ohio-555, ¶ 32.

{¶20} On March 19, 2018, J.B. was in his afternoon pre-kindergarten class at school. Eleven children are in the class which is supervised by a teacher and an associate teacher. The associate teacher ("Ms. O.") testified that she asked J.B. to pick up a glue stick he had dropped. The child refused because his back hurt and he did not want to bend over. After receiving J.B.'s permission to look at his back, Ms. O. lifted the child's shirt and saw that his back was covered with bruises. Because she felt bad for being stern with the child, requiring him to pick something up when he claimed he was in pain, Ms. O. apologized and gave J.B. a hug. At that time, Ms. O. felt a "giant lump" on the child's head. The associate teacher asked the other classroom teacher to take pictures of the child's injuries and she then sent J.B. to the school nurse's clinic.

{¶21} Ms. O. testified that the students are supervised at all times by two teachers and that J.B. had not fallen or otherwise injured himself at school that day. She described J.B. as a typical child who occasionally falls on the playground or collides with other children. She described the playground as a grassy area which includes a sand box and toy houses, but no jungle gyms. In any event, Ms. O. testified that the children had not gone outside for recess on the day she discovered J.B.'s injuries. At no time during that day did J.B. cry as though he had been injured.

{¶22}  Ms. O. testified that she had received her most recent training in recognizing signs of child abuse and neglect two months before she saw J.B.'s injuries.  Based on the nature of the bruises covering the child's back, Ms. O. suspected that the child had been abused.

{¶23}  The school nurse conducted a head-to-toe evaluation of J.B.  The child had a very large (1 ½ to 2 inches) black and blue lump on his head.  His back was covered with older bruises that were in a state of healing, having already turned green and yellow.  When the nurse asked J.B. how he received his injuries, the child made multiple statements that "Daddy" had caused them while angry.

{¶24}  The school principal ("Ms. L.") testified that she receives annual training to identify different types and levels of child abuse and neglect, including physical, sexual, and emotional abuse.  She has also been trained to look for indicators that a child is lying.  She was trained to know that purple bruises are new, while greenish or yellowish bruises are older and in a state of healing.  Ms. L. saw the newer lump on J.B.'s head and the older bruises covering his back when the school nurse called her to the clinic based on her suspicions of abuse.  The principal testified that some bruising on children is normal, given their "rumble-tumble" natures.  For example, she would expect children to exhibit bruising on knees, shins, and elbows where they have fallen.  Ms. L. emphasized that bruises on a child's torso, however, are not typical of the everyday activities of a child, but rather are suspicious and a cause for investigation.  As an example, she described an incident where a child came to school with a black and bruised eye, which is not a typical childhood injury.  After questioning the child, who did not appear to be lying, and receiving confirmation from three others, Ms. L. was satisfied that that child had been hit with a baseball during a game.  Accordingly, the principal did not report that incident to law enforcement.

{¶25} In J.B.'s case, however, Ms. L. suspected that the child had been abused based on the nature of his injuries, the lack of any incident report by a teacher indicating that the child had fallen or been injured at school, and her discussions with the school nurse. Ms. L. called the school resource officer who is a sheriff's deputy. She took photographs of the child's injuries at the deputy's request. Those photographs were admitted into evidence and show the multitude of bruises on J.B.'s back and the large discolored lump on his head.

{¶26} The LCCS caseworker testified that she received a hotline referral to the agency on March 19, 2018, regarding bruises on a child's back and a "goose egg" on the child's head. The caseworker was able to see the photographs of the child's injuries taken by the school principal. The next morning, the caseworker went to J.B.'s home where he was living with Mother, her boyfriend ("Boyfriend"), and another man. When no one answered the door, the caseworker sought assistance from the Sheriff's Department. Three deputies joined her at the home. Boyfriend answered and was angry because of the early hour. By the time the caseworker returned with the deputies, it would have been after 9:30 a.m.

{¶27} Based on information the caseworker had received from the referral and Sheriff's Department, she proposed a safety plan for the child that would require Boyfriend to vacate the home. Mother refused. She further refused to place the child outside the home. Based on concerns for the child's safety inside the home, the caseworker obtained an emergency order of temporary custody of J.B. Upon returning to retrieve the child, the caseworker heard yelling and the sound of things being thrown inside the home. Mother continued screaming and threatening the caseworker as the child was removed.

{¶28} The caseworker took J.B. to the hospital, spending the entire day with him, including while he was examined by a doctor. She testified that the child never tripped,

stumbled, or fell during normal play or activity throughout the approximately twelve hours they were together. The agency had a family team decision meeting, where the caseworker spoke with collateral contacts regarding the case. During discussions with Mother, the caseworker learned that Boyfriend spanks the child, but Mother denied any abuse. She discovered that the child refers to Boyfriend as "Daddy." The locations and severity of the child's injuries caused the caseworker to believe that the injuries were inflicted on the child, and not caused by a fall, despite Mother's assertions that J.B. is simply a very clumsy child. Based on her investigation, the caseworker substantiated the claim of physical abuse of the child by Boyfriend, but found that any claim of physical abuse by Mother was unsubstantiated. The caseworker was concerned that Mother refused to believe that Boyfriend was harming the child despite strong indications that he was, and that Mother was failing to keep J.B. safe.

{¶29} On cross-examination, Mother admitted that she has three other children who reside with their fathers, but she claimed that one child is in another home by "[m]utual agreement" without court intervention, while the other two were placed outside of her home based on "[f]alse accusations" of Mother's "failure to protect" them. Mother also admitted that she has a lifelong history of being in abusive relationships, first in her mother's home where her mother and her mother's many boyfriends abused her, and later when she habitually dated abusive men. Mother has dated Boyfriend for two years. She denied that Boyfriend is abusive, despite past allegations of violence made by an "enemy" of Boyfriend. In fact, Mother claimed that, in the thirteen years she has known Boyfriend, he has only lost his temper once. That occurred when the agency caseworker was removing J.B. from the home.

{¶30} Mother described Boyfriend as the primary caregiver of J.B., because Mother works daily from 3:00 p.m. until 11:30 p.m. The child is in school from 1:00 until 3:30 p.m.

three days a week. Even though Mother is home before the child goes to school, she testified that she does not get up until around 10:00 a.m., so Boyfriend takes care of the child in the mornings.

{¶31} Although she had been aware of them, Mother could not account for the bruises on J.B.'s back or the discolored lump on his head. She claimed, however, that the child is particularly clumsy and that he bruises easily. Mother asserted that J.B. falls out of bed a lot and chases the family's cat under tables. She has noticed these bruises, as well as previous ones, on the child; but she testified that she was not concerned. She has never taken J.B. to see a doctor for bruises because she "wasn't raised that way." Additionally, she believes that "a lot of bruises are typical."

{¶32} Mother testified that J.B. tells "crazy stories" and lies. When she has questioned the child about bruises, she admitted that sometimes J.B. says that "[m]y daddy" did it, and sometimes he says, "I don't know." Mother believes that the child answers "[a]ny question" with "[m]y daddy[,]" simply because he loves Boyfriend so much. Mother was adamant that, although Boyfriend paddles J.B. "when the case calls for it[,]" he has never abused the child.

{¶33} The other man ("Mr. P.") who lives with Mother and Boyfriend testified that he has seen Boyfriend put J.B. in a time-out for misbehavior, but that he has never seen either Mother or Boyfriend paddle the child. He testified that he has frequently heard "loud thud[s]" from the child's bedroom as J.B. plays alone, followed by the child's crying. When Mr. P. has checked on J.B. afterwards, the child reports that he is okay and continues playing. Mr. P. recounted times that J.B. has become frustrated, hitting himself and banging his head on the couch while throwing a tantrum. Although Mr. P. asserted that he frequently helps bathe J.B., he denied ever seeing any bruises on the child, not even around March 19, 2018. Mr. P. testified

that he is indebted to Mother and Boyfriend for their help, e.g., allowing him to live with them. He asserted that he would not lie for them, however.

{¶34} Based on a review of the evidence, this is not the exceptional case where the finder of fact clearly lost its way and created a manifest miscarriage of justice in adjudicating J.B. an abused, neglected, and dependent child. Multiple witnesses with experience identifying signs of child abuse testified that J.B.'s injuries indicated abuse. There was no evidence that J.B. injured himself at school on March 19, 2018, given that his small class was closely supervised by two teachers, neither of whom made an injury incident report that day. Neither did J.B. cry or indicate that he had been hurt at school. Accordingly, the evidence indicates that the child arrived at school with the large lump on his head. His back was covered with multiple large bruises that were healing but still causing the child pain. Photographs show the severe and extensive nature of J.B.'s physical injuries which he consistently claimed were caused by Boyfriend, whom the child called "Daddy," with an instrument the child could not identify. Mother, who admitted a lifelong history of victimization in abusive relationships, acknowledged that Boyfriend uses corporal punishment on J.B. and that J.B. frequently is covered in bruises, but nevertheless denied that Boyfriend would abuse the child. Instead, she incredibly claimed that J.B. receives extensive bruising on his torso from chasing the family's cat under tables. The pictures of the child's bruises do not appear to have been made by bumps from the underside of a table. Rather, they are lateral bruises that span from his shoulders to his hips. Despite the multitude of bruises on the child's back, Mother's housemate who frequently helps bathe the child denied ever seeing any bruises on the child. The housemate admitted he is in debt to Mother and Boyfriend for the significant help they have given him which reasonably indicates the housemate's bias.

{¶35} The clear and convincing evidence established that J.B. suffered physical injuries inflicted other than by accidental means. The reasonable inference is that Boyfriend, the child's primary caregiver, inflicted those injuries on J.B outside the realm of permissive corporal punishment. The child reported to the school nurse during her medical evaluation of him that Boyfriend, while angry, had hit him with something. Mother's assertions that the child is simply very clumsy are not borne out by other witnesses who testified that the child is a normally active child who is not prone to falling and self-injury. The child's injuries did not mesh with the history Mother provided for their basis. Accordingly, the juvenile court's finding that J.B. is an abused child is not against the manifest weight of the evidence.

{¶36} Mother has historically been in abusive relationships. Based on her upbringing, she is unable to recognize signs that her child requires medical attention. Two other of Mother's children have been removed based on her failure to protect them. Given Mother's adamant denial that Boyfriend was capable of harming J.B., despite the nature and severity of the child's injuries and his assertions that "Daddy" caused them, the clear and convincing evidence established that J.B. lacks adequate parental care due to the faults or habits of Mother. Moreover, without a parent who is willing and able to protect J.B. from abuse inside his home, the child's condition or environment warrants the state, in the child's interest, in assuming his guardianship. Accordingly, the juvenile court's findings that J.B. is a neglected and dependent child are not against the manifest weight of the evidence. Mother's third assignment of error is overruled.

### III.

{¶37} Mother's three assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

15

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

CARR, J.
HENSAL, J.
CONCUR.


APPEARANCES:

LORIE K. BROBST, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and EMILY W. KIRSCH, Assistant Prosecuting Attorney, for Appellee.

JUSTIN MILLER, Guardian ad Litem.