[Cite as *In re C.P.*, 2023-Ohio-1350.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

IN RE: C.P.

C.A. No. 30382

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No. DN 16 01 0046

DECISION AND JOURNAL ENTRY

Dated: April 26, 2023

STEVENSON, Judge.

{¶1} Appellant Father appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that awarded legal custody of his child to the child's maternal great aunt ("Aunt K.") and ordered restricted parenting time for Mother and Father. This Court affirms in part, reverses in part, and remands.

I.

{¶2} Mother and Father are the biological parents of C.P., born December 11, 2011. Mother was married to B.B. who was the child's father-figure during the first few years of her life, although the record does not disclose whether he and Mother were married when the child was born. B.B.'s parents, Mr. and Mrs. S., assumed the role of grandparents for the child. Father had no role in the child's life during that time and did not establish paternity until C.P. was four years old.

{¶3}    In 2014, Summit County Children Services Board ("CSB" or "the agency") received a sexual abuse referral based on an allegation that B.B. was sleeping naked in bed with the then-two-year-old C.P.  The agency could not substantiate the referral.

{¶4}    Thereafter, Mother's relationship with B.B. faltered and she began dating S.J., a Tier III sexual offender with a history of perpetrating offenses against children.  Mother and S.J. became engaged and he moved into Mother's home.  After Mother began leaving four-year-old C.P. in the care of S.J. and another sexual offender while she worked, CSB and Mother entered into a voluntary safety plan whereby the child began residing with her maternal grandmother ("Grandmother").  The agency asked Mother to obtain a mental health assessment and S.J. to obtain a psychological evaluation with a sexual offender component to determine his risk of reoffending.  Neither Mother nor S.J. submitted to assessments, and Mother continued to let S.J. babysit the child.

{¶5}    In January 2016, CSB filed a complaint alleging that C.P. was a dependent child. The juvenile court placed the child in the emergency temporary custody of Grandmother under the agency's protective supervision, ordered no contact between the child and S.J., and allowed Mother only supervised visitation.  The court further directed Mother to provide names of possible fathers of the child.  Shortly thereafter, genetic testing established Father's paternity of C.P.  Over the next six years, the child would be the subject of ongoing police and child welfare referrals, allegations of abuse, and acrimonious custodial and visitation disputes.

{¶6}    The juvenile court adjudicated C.P. a dependent child and placed her in the temporary custody of Grandmother under the protective supervision of CSB.  The court required supervision for all parental visits and maintained the no contact order between S.J. and the child.

That no contact order remained in effect throughout the juvenile court's involvement and continues today.

{¶7} Fifteen months after CSB filed its complaint, the juvenile court journalized the parents' agreement granting them joint legal custody pursuant to a shared parenting plan and naming Father the residential parent. Mother enjoyed liberal visitation. The juvenile court docketed the case closed. Two months later, Mother filed motions for contempt, modification of the shared parenting plan, interim temporary custody, and an order requiring supervision of Father's visits. Father countered by filing motions for contempt, child support, the reallocation of parental rights and responsibilities, modification of parenting time, and an order allowing only supervised visits for Mother. In addition, Father notified the juvenile court of his intent to relocate with the child from Ohio to Virginia.

{¶8} After thirteen months, eight various hearings, multiple interim orders, and an objection, Mother and Father reached another agreement whereby C.P. would remain in the parents' joint legal custody, with Father serving as the residential parent. The juvenile court ordered that the child would reside with Aunt K. while in Ohio for visitation with Mother. In addition, Aunt K. would supervise all visits by Mother and Grandmother. Mr. and Mrs. S. could see the child only in the discretion of Aunt K. On August 8, 2018, the juvenile court again docketed the case closed.

{¶9} Three months later, after Father had filed a case in Virginia seeking legal custody of C.P., Father moved the Summit County juvenile court to stay Mother's parenting time and relinquish further jurisdiction regarding the child. The juvenile court denied Father's motions. Mother then moved the court to hold Father in contempt for, among other allegations, denying her visitation during the Thanksgiving holiday and make up visitation during the child's winter break.

During this round of disputes, it took Mother and Father six and a half months to reach another agreement that was very similar to their most recent agreement. Particular to this judgment, however, was an order that B.B., Mr. S., and Mrs. S. were to have no contact with C.P. while she was in Ohio to visit Mother in recognition that the purpose of those visits was to nurture the Mother-child relationship. The juvenile court again docketed the case closed.

{¶10} In less than a month, Mother filed an emergency ex parte motion to enforce the juvenile court's recent judgment and restrain Father from removing the child from Ohio. Someone had made another allegation of sexual abuse of the child, this time naming Mother as the perpetrator. The report necessitated the fifth sexual abuse investigation and physical examination the child was forced to endure in her seven-year life. The juvenile court granted Mother's motions and C.P. resided with maternal family members throughout the summer of 2019. The trial court again closed the case.

{¶11} Thereafter, Father continued to attempt to circumvent the Ohio juvenile court's jurisdiction, purportedly obtaining an order of sole legal custody of the child from the family and juvenile court in Virginia Beach ("VBFJC"). The Summit County juvenile court denied Father's motion to transfer the case to VBFJC and continued to exercise jurisdiction over the parties. In the summer of 2021, the parties entered into another agreement regarding visitation. The juvenile court approved both Aunt K. and another maternal great aunt ("Aunt D.") to supervise Mother's visits, individually or together. Again, the agreement prohibited Mr. and Mrs. S. from having any contact whatsoever with the child when she was in Ohio for the purpose of visiting Mother. Instead of closing the case at that time, the juvenile court scheduled a status hearing a month later to evaluate the posture of the case.

**{¶12}** During her investigation at this time, the guardian ad litem identified several concerns regarding Father and Mr. and Mrs. S. Specifically, the guardian ad litem reported, inter alia, that Father and his wife punished C.P. when she had accidents due to a diagnosed medical condition and when the child denied that Mother and/or her stepfather sexually abused her; that punishments were excessive; that Mr. and Mrs. S. continued to make untruthful allegations of abuse regarding the child and influence Father's belief that C.P. is unsafe with her maternal family; that Father had deprived Mother of physical contact with the child for almost two years contrary to court orders; and that Father had lied to the guardian ad litem about the child's presence in Ohio to visit with Mr. and Mrs. S.

**{¶13}** Based on the concerns raised by the guardian ad litem, Mother moved to add CSB as a party to the ongoing case and for emergency temporary custody of the child to Aunt K. under the protective supervision of the agency. The juvenile court granted those motions; limited Mother's and Father's visits to one 30-minute phone call per week with no in-person visitation; and ordered that the child would have no contact with her stepfather, B.B., or Mr. and Mrs. S.

**{¶14}** Mother moved for legal custody to Aunt K., recognizing that the child could not live with Mother because she was married to a Tier III sexual offender. Father moved for legal custody to Mr. and Mrs. S., asserting that he no longer wanted the child to reside in his home because the ongoing disputes had become too disruptive to his wife and their four other children. Prior to the hearing on the parents' motions, the juvenile court reinstated supervised physical visitation for Mother and Father. The court authorized either Aunt K. or Aunt D. to supervise the parents' separate visits.

**{¶15}** The magistrate held a hearing on Mother's and Father's competing motions for legal custody to third parties and thereafter granted Mother's motion for legal custody to Aunt K.

and issued various visitation orders for the parents, as well as the child's half- and step-siblings. Father timely objected, challenging both the custody and visitation orders as contrary to the best interest of the child. Mother and the guardian ad litem responded in opposition to Father's objections. Upon consideration of the parties' briefs and the hearing transcript, the juvenile court overruled Father's objections, granted legal custody of C.P. to Aunt K., and issued orders regarding visitation. Father timely appealed and raises three assignments of error for review.

II.

**ASSIGNMENT OF ERROR I**

THE JUVENILE COURT[']S DECISION GRANTING MOTHER'S MOTION TO PLACE THE MINOR CHILD IN THE CUSTODY OF [AUNT K.] AND DENYING FATHER[']S MOTION TO PLACE THE CHILD WITH [MR. AND MRS. S.] IS NOT IN THE BEST INTERESTS OF THE MINOR CHILD, CONSTITUTES AN ABUSE OF DISCRETION AND IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED.

{¶16} Father argues that the juvenile court's judgment awarding legal custody of C.P. to Aunt K. is against the manifest weight of the evidence. This Court disagrees.

{¶17} This Court has held:

On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest. Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

(Internal citations and quotations omitted.) *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7.

{¶18} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the

credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶19} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. In that regard, the juvenile court is guided by the best interest factors enunciated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 16.

{¶20} In addition, the juvenile court may also look to the best interest factors in R.C. 3109.04(F)(1) for guidance. *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850 and 15CA010860, 2017-Ohio-1, ¶ 17. While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical health of all persons involved; the

parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶21} C.P.'s custodial history is set out in great detail above. She resided with Aunt K. during the six months prior to the legal custody hearing. Aunt K. has legal custody of two other children who are close in age to C.P. The three children get along well. C.P. is very comfortable in Aunt K.'s home and refers to Aunt K. as her "best friend."

{¶22} Aunt K. had been involved in the child's case for four years, providing a residence for the child during extended visitation periods for the maternal family and supervising visits in both her home and the community. Aunt K. is familiar with the child's maternal family, as well as Father. Mr. and Mrs. S. live around the corner from Aunt K.

{¶23} At the time of the legal custody hearing, C.P. was ten years old and in fourth grade. She loves school, where she does well and has many friends. The child has been in counseling for several years. Earlier counseling was geared toward determining whether the child had been sexually abused, as Mr. and Mrs. S. alleged on multiple occasions. All allegations of sexual abuse were unsubstantiated, and the child's counseling now focuses on her adjustment to her current situation after repeated custodial and visitation disputes.

{¶24} C.P. was diagnosed a couple years ago with encopresis, a condition wherein her bowels seep after becoming impacted. The child would have soiling accidents which she could neither sense nor control. Stress exacerbates the symptoms. While in Aunt K.'s care, C.P. was diagnosed by medical professionals and placed on a treatment protocol which greatly alleviated the symptoms which caused embarrassment for the child. Her prognosis anticipates that it will

take a couple years before her nerves regenerate so that she redevelops sensation allowing her to fully control her bowel movements.

{¶25} C.P. is comfortable discussing her bowel issues and symptoms indicating the need for a cleanse or enema with Aunt K. Aunt K. provides the child with sanitary pads which prevent her from soiling her clothing and becoming embarrassed. Father, on the other hand, has not allowed the child to wear pads and has punished her harshly for having bowel accidents. Father believes the assertions of Mr. and Mrs. S. who have determined, without input from medical professionals, that C.P.'s bowel issues stem from sexual abuse and interactions with Mother, despite no evidence to support that.

{¶26} Aunt K. testified that she supports following the recommendations of professionals involved with the child and she will maintain C.P. in counseling and continue daily and bimonthly treatments for encopresis. Mr. and Mrs. S. were not familiar with the child's medical diagnosis. Mr. S. testified that he would seek a second opinion regarding it, even though Aunt K. and the guardian ad litem testified that the child's current treatment protocols were managing her symptoms well. Mr. and Mrs. S.'s adult daughter, with whom C.P. has spent time, is a registered nurse. Nevertheless, she was not familiar with the term "encopresis," and testified that she believed the child was merely incontinent and that it seemed odd to treat the child as if she were constipated. Mr. and Mrs. S.'s daughter also speculated that the child's bowel issues were related to abuse.

{¶27} C.P. has not wavered from expressing love and affection for Mother, Father, her half- and step-sisters, and many members of her maternal family. She told both the CSB caseworker and the guardian ad litem that she wants to live with Aunt K. The caseworker and guardian ad litem each testified, however, that C.P. was adamant that she did not want to live with

or even see Mr. and Mrs. S. In fact, the caseworker and Aunt K. testified that the child referred to Mrs. S. as both "weird" and "creepy."

{¶28} The guardian ad litem opined that legal custody to Aunt K. would be in the child's best interest because of the strong bond and excellent relationship the two shared, the consistent care the child received in that home, and their blood relationship. The guardian ad litem observed the child in Aunt K.'s home and found it to be a safe and appropriate environment. On the other hand, the guardian ad litem had no opportunity to observe C.P. in the home of Mr. and Mrs. S. because neither they nor Father informed her that the child was in that home during the summer for a two-week visit. Significantly, Father did not inform Mother that the child was in Ohio with Mr. and Mrs. S. during that time either. The guardian ad litem testified that legal custody to Mr. and Mrs. S. would be contrary to the child's best interest because they had no realistic understanding of the child's history, and instead incessantly made (or caused to be made) referrals alleging sexual abuse of the child by Mother and stepfather and lack of proper supervision by maternal relatives, none of which could be substantiated by child welfare agencies or law enforcement. After speaking at length with the Akron Police Department detective who investigated and debunked Mr. and Mrs. S.'s repeated allegations of abuse, the guardian ad litem testified that she could not seriously consider the couple as legal custodians for the child.

{¶29} Aunt K. testified that she understood the ramifications of legal custody and that Mother and Father would retain residual parental rights and responsibilities. She testified that she would seek minimal child support from the parents. She agreed to facilitate visitation for Mother, Father, and the child's siblings. Aunt K. testified that she was willing to supervise parental visits, prohibit the child's contact with her stepfather, and honor all other court orders.

{¶30} On the other hand, Mr. S. testified that he was willing to recognize parental rights "[a]s long as [C.P.'s] safe." He had a history of believing the child was at risk with her maternal relatives despite evidence to the contrary. Mrs. S. testified that she understood that the case involving C.P. was to determine how best to maintain the relationship between the child and Father. Mrs. S. did not seem concerned about maintaining the child's relationship with Mother and testified that any Mother-child visits "need[ ] to be highly supervised" at a private visitation center based on prior issues Mrs. S. perceived regarding the child's safety with Mother. Mrs. S. acknowledged allegations that her son B.B. had slept naked with the child when she was two years old, but Mrs. S. discounted those allegations because the then-two-year-old C.P. had not articulated any abuse. Mrs. S. testified that B.B. continues to live in her home.

{¶31} C.P.'s custody and visitation with family members has fluctuated for six years as Mother and Father have engaged in ongoing disputes and third parties have repeatedly alleged various types of abuse to the child. The child deserves stability in a safe environment with a custodian who takes her medical needs seriously while not subjecting the child to trauma associated with unsubstantiated allegations of abuse. Aunt K. has been a stable, loving, and protective presence in the child's life for many years. She testified that she is willing and able to provide a permanent home for the child until adulthood. The juvenile court found her to be a suitable legal custodian for two other children, a great niece and a great nephew, in another case. Aunt K. asserted her willingness to facilitate and supervise visitation for both parents.

{¶32} Mr. and Mrs. S. had not communicated with the child for six months at the time of the hearing. They expressed their willingness to provide a home for C.P. during her minority, as well as to facilitate visitation for Father and the child's half- and step-siblings. They have historically interfered with Mother's visitation and relationship with the child, insisting that C.P.

acknowledge sexual abuse by Mother and stepfather, despite lacking evidence to support those allegations.

{¶33} Based on a thorough review of the record, this is not the exceptional case in which the trier of fact clearly lost its way and created a manifest miscarriage of justice by awarding legal custody of C.P. to Aunt K. Aunt K. has demonstrated a commitment to the child throughout the lengthy juvenile court case by supervising family visits, working with others involved with the child, and assuming the role as C.P.'s temporary custodian. Aunt K. has exercised caution and sound judgment regarding the child's safety, obeying court orders and prohibiting contact between the child and unauthorized persons. C.P. is happy, comfortable, and thriving in Aunt K.'s home. The child has been able to maintain a relationship and bond with both maternal and paternal family members. Aunt K. complies with the recommendations of the mental health and medical professionals who work with the child. C.P. wishes to live with Aunt K. The child adamantly asserted that she did not want to see Mr. and Mrs. S. at this time. The guardian ad litem opined that an award of legal custody to Aunt K. would meet the child's best interest because Aunt K. is willing and able to meet the child's basic and special needs and the two have a strong bond and familial relationship. On the other hand, Mr. and Mrs. S. have historically interfered with Mother's visitations and engaged in activities that have subjected the child to multiple sexual abuse interviews and physical examinations where no evidence supported those allegations.

{¶34} After six years of ongoing disputes regarding the child's custody and relationships with her parents, C.P. deserves stability with a custodian who recognizes her need to maintain a relationship with both paternal and maternal family members. The evidence demonstrates that Aunt K. is likely to facilitate those relationships for the child, whereas Mr. and Mrs. S. are not. Under the circumstances, the juvenile court's findings that an award of legal custody to Aunt K.

is in the child's best interest, while legal custody to Mr. and Mrs. S. is not, are not against the manifest weight of the evidence. Father's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE JUVENILE COURT[]'S DECISION CONCERNING MOTHER'S COMPANIONSHIP TIME WITH THE MINOR CHILD IS NOT IN THE BEST INTERESTS OF THE MINOR CHILD, CONSTITUTES AN ABUSE OF DISCRETION AND IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED.

{¶35} Father argues that the juvenile court abused its discretion by allowing Mother to visit with the child under the supervision of only one of the child's maternal great aunts, i.e., either Aunt K. or Aunt D., and not under the joint supervision of both. This Court disagrees.

{¶36} This Court reviews a trial court's visitation order for an abuse of discretion. *In re K.D.*, 9th Dist. Summit No. 28459, 2017-Ohio-4161, ¶ 26. Unless the trial court was unreasonable, arbitrary, or unconscionable in ordering visitation, we must uphold the judgment. *Id.*, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard of review, we may not substitute our judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶37} When a child is placed in the legal custody of a third party, parents retain residual rights, privileges, and responsibilities, which include the "privilege of reasonable visitation[.]" *See* R.C. 2151.353(A)(3)(c). Moreover, R.C. 2151.359(A)(1) allows the juvenile court to limit any person's interactions with a child if those restrictions are necessary for the welfare of the child. This "includes the authority to limit or even prohibit parental visitation with a child placed in the legal custody of another adult." *In re C.T.*, 9th Dist. Summit No. 30156, 2022-Ohio-3464, ¶ 17, citing *In re M.B.*, 9th Dist. Lorain Nos. 11CA010060 and 11CA010062, 2012-Ohio-5428, ¶ 34. "In determining the appropriate visitation for a parent who has lost legal custody of the child, the

trial court must consider the totality of circumstances affecting the best interest of the child." *In re L.S.*, 9th Dist. Lorain No. 21CA011770, 2022-Ohio-3281, ¶ 30.

{¶38} Father argues that the juvenile court erred by only requiring either Aunt K. or Aunt D. to supervise Mother's visits with the child, rather than requiring that both aunts supervise every visit. The trial court found that Aunt K. was suitable to provide a safe and stable home for C.P. Moreover, the court had also earlier approved Aunt D. as an appropriate visitation supervisor. Father cites to no evidence that the child suffered any harm or was at risk for harm at any time either aunt provided care for the child or supervised any visits. Moreover, Father fails to cite to any evidence demonstrating that Mother has been inappropriate in her interactions with the child or has exposed C.P. to her stepfather. Nevertheless, in an abundance of caution, the juvenile court continued to restrict Mother to supervised visitation. As both Aunt K., the current legal custodian, and Aunt D. had demonstrated their commitment to the child's welfare and well-being, the juvenile court was not unreasonable when it ordered that either aunt could supervise Mother's visits. Accordingly, the trial court did not abuse its discretion by not requiring two visitation supervisors at each of Mother's visits. Father's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE JUVENILE COURT'S DECISION CONCERNING FATHER'S COMPANIONSHIP TIME WITH THE MINOR CHILD IS NOT IN THE BEST INTERESTS OF THE MINOR CHILD, CONSTITUTES AN ABUSE OF DISCRETION AND IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED.

{¶39} Father argues that the juvenile court abused its discretion by failing to grant him any in-person visits with the child and limiting his visitation to merely telephone or video visitation. This Court agrees.

**{¶40}** The general standard of review regarding visitation orders is set forth under Father's second assignment of error. Father also argues that the juvenile court was unreasonable in depriving him of in-person visitation that the magistrate had awarded him in consideration of the best interest of the child. "While this Court generally reviews the trial court's action with respect to a magistrate's decision for an abuse of discretion, we do so with reference to the nature of the underlying matter." *In re J.B.*, 9th Dist. Lorain No. 18CA011424, 2019-Ohio-1929, ¶ 7.

**{¶41}** After considering the evidence adduced at the hearing, the magistrate awarded Father weekly telephonic or electronic (video) visitation, as well as opportunities for in-person visits. Setting those parameters, the magistrate ordered:

> During summer vacation from school, Father may visit [with C.P.] when he travels to Ohio for this purpose from 10:00 am to 7:00 pm in the community as agreed to by the legal custodian. When the child's counselor or therapist determine that she is ready to expand the location of summer visitation by Father the 5 day summer visitation may, with the agreement of the legal custodian and the child's counselor take place including overnight visitation in the home of Father's in-laws in Salem Ohio. Further, Father shall provide 14 days['] notice to the legal custodian when he wishes to have any summer visitation. If there is no agreement for Father's proposed visitation location Father may arrange for visitation at Common Ground at Father's expense. Father's visitation shall not take place at the home of [Mr. and Mrs. S.] and they are not to be included during any visitation by Father until approved by the Legal Custodian and the child's counselor[.]

Moreover, the magistrate ordered that "[v]isitation by either parent can be expanded or modified upon the agreement or recommendation of the child's counselor or therapist and the legal custodian."

**{¶42}** Only Father filed objections to the magistrate's decision. No other party challenged the provisions for in-person visits between Father and the child. In ruling on Father's objections, the juvenile court recognized that, as to his challenge regarding his visitation award, "Father requests that, should [Aunt K.] retain Legal Custody, he be permitted to visit [C.P] at [Mr. and Mrs. S.'s] home[.]" The juvenile court overruled that objection, finding that "the Visitation Orders

for Mother and Father should remain unchanged." More specifically, the trial court found that "the Magistrate's restrictions of Father's visits are appropriate given [Mr. and Mrs. S.'s] past involvement in [the child's] case." The juvenile court noted that "[Aunt K.] is able and willing to implement and supervise visitation with [the child's] parents and other approved individuals [the child] wishes to see." After reiterating the order awarding Father weekly telephonic or electronic visitation, the juvenile court further ordered that "Father's visitation shall not take place at the home of [Mr. and Mrs. S.], and they are not to be included during any visitation by Father until approved by the Legal Custodian and [C.P.'s] counselor."

{¶43} The juvenile court made no findings that would indicate it believed that in-person visitation with Father posed an inherent threat to the child. It did not find that the best interest of the child required limiting Father's contact with C.P. to mere remote interactions. Nevertheless, the juvenile court appears to have modified Father's visitation in a way that drastically restricted his contact with the child. No other party argues that Father retained the opportunity to visit in person with the child, and this Court's reading of the enumerated orders in pari materia supports the conclusion that the final judgment is too vague to grant Father more than remote visitation. Based on the juvenile court's evidentiary findings, it appears that the omission of any order granting Father in-person visits with C.P. was an oversight by the trial court that requires clarification. As the juvenile court's pronouncement that "[a]ll other orders not in conflict with those contained herein shall remain in full force and effect[ ]" is too vague to support enforcement of any attempt by Father to exercise in-person visits, this Court is compelled to remand the matter to the trial court for such clarification. *See In re K.D.*, 2017-Ohio-4161, at ¶ 30. Father's third assignment of error is sustained.

III.

{¶44} Father's first and second assignments of error are overruled. His third assignment of error is sustained. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed in part, reversed in part, and the cause remanded for further proceedings consistent with this opinion.

Judgment affirmed in part,
reversed in part,
and remanded.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

SCOT STEVENSON
FOR THE COURT

SUTTON, P. J.
CONCURS.

HENSAL, J.
CONCURRING IN PART, AND DISSENTING IN PART.

{¶45} I concur in the majority's resolution of Father's first and second assignments of error. I respectfully dissent, however, as to the majority's resolution of Father's third assignment of error, as I would conclude that Father retained the opportunity for in-person visitation with the child.

{¶46} After addressing the specific terms of telephonic/electronic visits with the child for Father and her half- and step-siblings, the juvenile court issued an order addressing Father's visitation in general. That order proscribed any involvement by Mr. and Mrs. S. in Father's visits until certain conditions were met. The following order stated that "[a]ll other orders not in conflict with those contained herein shall remain in full force and effect."

{¶47} The juvenile court addressed Father's objection to the magistrate's decision that prohibited him from visiting with C.P. in the home of Mr. and Mrs. S. Given the juvenile court's overruling that specific objection, coupled with its findings that the parents' visitation orders "should remain unchanged[,]" and that Aunt K. was "able and willing to implement and supervise visitation with [the child's] parents[,]" I would conclude that the judgment is not too vague to maintain the prior orders allowing Father in-person summer visitation and the opportunity for expanded and modified visitation. Accordingly, I would overrule Father's third assignment of error and affirm the juvenile court's judgment in full.

APPEARANCES:

MICHAEL A. PARTLOW, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

ANGELA M. KILLE, Attorney at Law, for Appellee.

ALEXANDRA HULL, Guardian ad Litem.